IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

GREGORY MITCHELL                    :No.:  02-3717

                                    :

        vs.

                                    :

WARREN OBENSKI, MATTHEW GALE,       :
ET AL.

## DEFENDANTS, WARREN OBENSKI, MATTHEW GALE, ET AL.'S EXHIBIT LIST

Defendants by and through their counsel David P. Karamessinis, Esquire of the law firm of Devlin and Devine provide the within Exhibits in support of their Motion for Summary Judgment

| **EXHIBIT** | **DESCRIPTION** |
|---|---|
| "A" | Uwchlan Township Police Department Incident Report form dated 5/26/2000 (9 pages) |
| "B" | Statement of Rhonda Mitchell dated 5/31/2000 (2 pages) |
| "C" | 4/10/00 and 4/11/00 Fairfield Inn Telephone Records |
| "D" | Deposition Transcript of Warren Obenski, 6/25/2003 |
| "E" | Police Criminal Complaint and Affidavit of Probable Cause |
| "F" | Affidavit of Due Diligence |
| "G" | Arrest Warrant |
| "H" | Deposition Transcript of Matthew Gale, June 25, 2003 |
| "I" | Rhonda Morris – Timeline (3 pages) |

"J"                                    *Commonwealth v. Mitchell,*
                                       Transcript of Preliminary Hearing –
                                       10/3/2000

"K"                                    Plaintiff's Amended Complaint

                          DEVLIN & DEVINE

                          By:    _____
                                 /sDavid P. Karamessinis, Esquire
                                 ID#: 50836
                                 Attorney for Defendants
                                 Suite 200, 100 West Elm Street
                                 Conshohocken, PA 19428
                                 610-397-4635

Date: _____

2

# EXHIBIT "A"

# Uwchlan Township Police Dept.

**UT-00-03452    5/26/2000**

OFFICER: 131    OBENSKI, WARREN KEITH

☑ Investigation ☐ Accident ☑ Arrests Made ☐ Suspects

## Incident Report Form

| 1. Log Number UT-00-03452 | 1a. Incident Number 08-050-03452 | 1b. File Number | | 1c. Case Number | 2. UCR 17 | SEX OFFENSES (EX 02,160) |
|---|---|---|---|---|---|---|

| 3. Incident Type 2600  All Other Offenses | 4. Dispatcher | 5. Source PHONE | 6. District 300 | 7. Status CA |
|---|---|---|---|---|

| 8. Date Received 5/26/2000 | 8a. Rcvd | 8b. Disp 1335 | 8c. Arrv 1430 | 8d. Clrd 1530 | 9. Disposition RI  Report Initiated |
|---|---|---|---|---|---|

INCIDENT OCCURRED AT OR BETWEEN       8e. Earliest Date and Time       8f. Latest Date and Time

| 10. Location 4  N. POTTSTOWN PK | 10a. Cross Street | 10b. Intersection ☐ |
|---|---|---|

| 11. Premise Code HOTEL  Hotel | 12. Business Name FAIRFIELD INN |
|---|---|

13. Modus Operandi Coding

ENTRY:

EXIT:

METHOD:

VICTIM:

PROPERTY:

AREA:

TIME OF DAY:

14. Caller / Complainant Type       **N - Normal**

| 15. Involved Persons | STREET ADDRESS | INVOL | DOB | SSN | R | S | PHONE |
|---|---|---|---|---|---|---|---|
| Arr DATE  ARREST#  PriCHG | DESCRIPTION | Cnt AddlCHG | | DESCRIPTION | | | Cnt PL  Vd |
| MORRIS, RHONDA | 1160 NORTH MANOR ROAD | VIC | 10/14/1971 | 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 | W | F | (610) 942-9345 |
| | HONEY BROOK, PA 19344 | | | | | | |
| SOMERS, ALAN | 50 SOUTH WELSH POOL ROAI | ATTY | | | W | M | (610) 594-2222 |
| | EXTON, PA 19341 | | | | | | |
| TWIDELL, MARK | EAST BRANDYWINE POLICE D | INVLD | | | W | M | |
| | , | | | | | | |
| STACKHOUSE, RAYMOND | PHILADELPHIA INTER. AIRPOI PHILA, PA 19153 | INVLD | | | | | (610) 362-7940 |
| MITCHELL, GREGG | 5 RIVIERA COURT | SUSP | 12/11/1963 | 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 | B | M | (301) 622-4318 |
| | SILVER SPRINGS, MD 20904 | | | | | | |
| DONALDSON, JERRY | 2345 CRYSTAL DR. | PERCT | | | W | M | (703) 872-5338 |
| | ARLINGTON, VA 22227 | | | | | | |
| COLE, KAREN | | PERCT | | | | F | (703) 417-8563 |

| WSIRF-01 | UT-00-03452 | 5/26/2000 | ☐ APPROVED BY: | ON: | PAGE 1 |
|---|---|---|---|---|---|

# Uwchlan Township Police Dept.

**UT-00-03452**    **5/26/2000**

OFFICER: 131    OBENSKI, WARREN KEITH

☑ Investigation ☐ Accident ☑ Arrests Made ☐ Suspects

## Incident Report Form

| | | | | |
|---|---|---|---|---|
| | , VA | | | |
| FIELDS, SUSAN | | ATTY | | W F (610) 431-0117 |
| | , | | | |
| CREAGER, JOHN | | PERCT | | M (703) 417-8560 |
| | , | | | |
| SANGER, KENNETH | | PERCT | | M (240) 773-5500 |
| | SILVER SPRINGS, MD | | | |
| CROWN, ROBIN | | PERCT | | 240-773-5377 |
| | , MD | | | |

| 22. Comments / Narratives | CREATED BY / ON | | UPDATED BY / ON | | LOCK |
|---|---|---|---|---|---|
| BLOTTER | WKO | 5/26/2000 | WKO | 5/26/2000 | N |

RHONDA MORRIS CAME TO THE POLICE STATION TO REPORT A FALSE IMPRISONMENT INCIDENT THAT OCCURRED AT THE FAIRFIELD INN IN MID-APRIL OF THIS YEAR.  REPORT TO BE COMPLETED ON 5/27.

| INCIDENT | WKO | 5/27/2000 | SDW | 6/28/2000 | N |
|---|---|---|---|---|---|

All Other Offenses
Incident #08-050-03452
Off. W. Obenski
5/27/00

On this date at 1:35 p.m., I was requested to call a Rhonda Morris, in reference to an incident that had previously occurred at the Fairfield Inn in April of this year.  When I called and spoke with Morris, she had stated that she wanted to have a subject arrested for false imprisonment, after she was forcibly held in a hotel room by a co-employee.  At this point, I requested that Morris respond to the police station, where I could interview her.

At approximately 3:00 p.m., Morris arrived at the police station, along with her civil attorney, Alan Somers.  Morris then gave this account of the incident.

In mid April of this year, she had dropped off a co-worker of U.S. Airlines, Gregg Mitchell, at the Fairfield Inn in the late afternoon.  Morris had dated Mitchell for approximately two weeks in January of this year.  Morris then went to her residence in Wallace Township.  Once home, Morris was checking her e-mail on her computer, when Mitchell contacted her over the internet, via AOL's instant messenger service.  Mitchell told Morris that he was having an "appendix attack" and that he needed her to come to the hotel and help him.

| WSIRF-01 | UT-00-03452 | 5/26/2000 | ☐ APPROVED  BY: | ON: | PAGE  2 |
|---|---|---|---|---|---|

# Uwchlan Township Police Dept.

**UT-00-03452**    **5/26/2000**

OFFICER: 131    OBENSKI, WARREN KEITH

☑ Investigation ☐ Accident ☑ Arrests Made ☐ Suspects

## Incident Report Form

When Morris told Mitchell to call an ambulance, he refused, convincing her to go to the Fairfield Inn.

Morris said that she drove over to the hotel, and went to Mitchell's room, where he was acting like he was in pain, by clutching his side. Morris said that they talked for awhile and Mitchell said that he was starting to feel better. Mitchell then grabbed Morris, while they were both standing, and forced her onto the bed, with Mitchell falling onto the bed holding onto her.

Once on the bed, Mitchell forcibly kept Morris on the bed, and refused to let her up. Mitchell was then trying to get Morris to engage in sex with him, in which Morris continually refused to do. Mitchell then told Morris that he had accessed her e-mail account, and had been reading her e-mails.

Mitchell then pulled Morris off of the bed, grabbing her on her upper arms, which Morris said left a bruise. Mitchell then forcibly placed Morris into a chair, in front of Mitchell's laptop computer. Mitchell then stood behind Morris with one hand on her shoulder, keeping her in the chair, while he leaned over and showed Morris her e-mail account.

Morris was able to get out of the chair and make her way towards the door, but Mitchell blocked her exit, and started to get close to Morris, making her walk back into the room. Morris started to yell at Mitchell, "let me go" and "let me leave." Morris said that when she started to yell, someone knocked on the door, and identified themselves as housekeeping without opening the door. Mitchell told the person that everything was alright, and the subject went away.

Morris then sat back down in the chair, and Mitchell sat on the edge of the bed. At this point, Mitchell started to calm down, and act emotional. Morris then started to talk to Mitchell again, telling him that she was going to leave, and that he was not going to do anything. Morris then got up from the chair, and walked out of the room.

Morris stated that since that time, Mitchell has harassed her by telephone, pager and e-mails, and that she had reported those incidents to Officer Mark Twidell of the East Brandywine Police Department. Additionally, she has notified U.S. Airways corporate security manager, Raymond Stackhouse, of these incidents, and other incidents involving Mitchell using her U.S. Airways' password to access her personal information. It was Stackhouse that requested that Morris contact this department to advise us of this incident.

Morris will be completing a detailed statement, that she will be delivering in a few days. Morris is unsure if she wants any further police involvement at this juncture.

Investigation pending.

## Uwchlan Township Police Dept.

**UT-00-03452**    **5/26/2000**

OFFICER: 131    OBENSKI, WARREN KEITH

☑ Investigation ☐ Accident ☑ Arrests Made ☐ Suspects

### Incident Report Form

---

**SUPPLEMENTAL #1**    WKO    5/31/2000    SDW    6/28/2000    N

All Other Offenses
Incident #08-050-03452
Supplemental #1
Off. W. Obenski
5/28/00

On this date Sergeant Lester retrieved a copy of the room register from the Fairfield Inn
for Gregg Mitchell.  This register showed that Mitchell had checked into room 205 on
4/10/00 and departed on 4/11/00. This register also showed several phone calls, some of
which were made to Morris' home phone and cellular phone.

**SUPPLEMENTAL #2**    WKO    5/31/2000    SDW    6/28/2000    N

All Other Offenses
Incident #08-050-03452
Supplemental #2
Off. W. Obenski
5/31/00

On this date at 1:15 p.m., I met with Morris at the police station.  Morris provided me with
a detailed written account of the incident that had occurred on 4/10/00.  Additionally, Morris
stated that Mitchell has send further e-mails to her, continuing to harass her.  At this point,
she requested to press criminal charges.

Morris also related that Mitchell's house in the Pittsburg area had burned down, and that
he had received a large insurance settlement.  Mitchell in the past, had bragged that he had
intentionally set fire to his neighbors house, which then burned down his residence.  Mitchell
told Morris that he had rented his house, and that his renters and neighbors were away
when he set the fire.  He continued to brag that he was a paramedic, and was familar with
how the fire department worked, and had no trouble setting fire to his to make it look like an
accident.  I will attempt to contact the Pittsburg Police Department, to notify them of this
potential arson.

I then attempted to contact Mitchell at the phone number provided, but received another
persons answering machine.  I then left a message for Raymond Stackhouse, the
Corporate Security Manager for U.S. Airways, Philadelphia Office to contact me.

A warrant will be issued for Mitchell for False Imprisonment, Harrasment and Stalking and
Disorderly Conduct.

 Investigation pending.

---

WSIRF-01    UT-00-03452    5/26/2000    ☐ APPROVED  BY:    ON:    PAGE    4

**Uwchlan Township Police Dept.**

UT-00-03452    5/26/2000

OFFICER: 131    OBENSKI, WARREN KEITH

☑ Investigation ☐ Accident ☑ Arrests Made ☐ Suspects

**Incident Report Form**

| SUPPLEMENTAL #3 | | MDG | 6/9/2000 | MDG | 10/7/2002 | N |

ALL OTHER OFFENSES
INCIDENT#08-050-03452
OFFICER M. GALE
SUPPLEMENTAL #3
6/9/00

On this date, at approximately 12:30 P.M., I obtained a warrant from District Court 15-2-07 for Gregg Mitchell's arrest. At 1:30 P.M., I spoke to Martha Gay, the administrator of the Fugitive Extradition Unit. She authorized a Zone #1 extradition for Mitchell, covering New York, Delaware, Maryland and Virginia.. At 1:00 P.M., I had Dispatcher #146 enter Mitchell into N.C.I.C. as a fugitive.

At approximately 3:00 P.M., I spoke to Jerry Donaldson, a Regional Manager for U.S. Air. He advised that after speaking to the Supervisor of Inflight Services, that Gregg Mitchell will be arriving at Washington National Airport on 6/10/00, at 1:45 P.M. on flight 1102 from Jacksonville.

At 5:00 P.M., I spoke to Sgt. Karen Cole of the Metro-Washington Airports Authority P.D. I faxed her a copy of the warrant. She advised that my contact person for 6/10/00 will be Sgt. Szymanski.

| SUPPLEMENTAL #4 | | MDG | 6/10/2000 | SDW | 6/28/2000 | N |

ALL OTHER OFFENSES
INCIDENT #08-050-03452
OFFICER M.GALE
SUPPLEMENTAL #4
6/10/00

On this date at approximately 8:00 A.M., I received a call from Sgt. John Creager of the Metro-Washington Airports Authority P.D.. He advised that upon checking N.C.I.C., that Virginia is not a surrounding state covered under zone #3 extradition. I called the Chester County Police Dispatch back and confirmed that zone #3 does not cover Virginia as far as extradition. I was advised that the instructions were probably confusing to the dispatchers and this was an oversight. Simply, Chester County will not extradite from Virginia.

I spoke to Assistant District Attorney Susan Fields. After being given the circumstances surrounding this case, she advised that the zone will not be changed to allow Virginia to hold Michell. I called Creager back and aborted our arrangements.

At approximately 12:10 P.M., I spoke to Officer Kenneth Sanger of the Montgomery County Police Department. After confirming that Mitchell's residence is in thier jurisdiction, I faxed him a copy of our warrant. Sanger stated that they will attempt to pick him up later this date.

| SUPPLEMENT #5 | | DVM | 6/18/2000 | SDW | 6/28/2000 | N |

| All Othe UT-00-03452 | 5/26/2000 | ☐ APPROVED BY: | ON: | PAGE 5 |

WSIRF-01

| **Uwchlan Township Police Dept.** | **UT-00-03452** | **5/26/2000** |
|---|---|---|
| | OFFICER: 131 | OBENSKI, WARREN KEITH |
| ☑ Investigation ☐ Accident ☑ Arrests Made ☐ Suspects | | **Incident Report Form** |

Incident #08-050-03452
Sgt. D. McClure
06-17-00

This afternoon at 6:00PM, we were requested to return a call to Officer Sanger of the Montgomery County, Maryland PD. Officer Sanger stated that he picked up Gregg Mitchell from our active warrant. He is being held in their lock up until Monday morning. Sometime Monday morning, he will appear in court to determine if he will waive extradition. They will notify us on Monday of Mitchell's decision.

| **SUPPLEMENT #6** | | DVM | 6/18/2000 | SDW | 6/28/2000 | N |
|---|---|---|---|---|---|---|

All Other Offenses
Incident #08-050-03452
Sgt. D. McClure
06-18-00

This morning at 10:00AM, I called the Morris residence and spoke with Rhonda's mother. I advised her that Gregg Mitchell was in custody in Maryland with a hearing pending tomorrow concerning extradition. If Rhonda has any other questions, she should feel free to call.

| **SUPPLEMENTAL #7** | | DJA | 6/20/2000 | SDW | 6/28/2000 | N |
|---|---|---|---|---|---|---|

ALL OTHER OFENSES
INCIDENT #08-060-03452
SUPPLEMENTAL #7
OFF. D. AHERNE
6-20-00

ON THIS DATE AT 1:38PM, DETECTIVE CROWN FROM THE MONTGOMERY COUNTY POLICE DEPARTMENT CALLED AND STATED THAT GREGORY MITCHELL WAIVED EXTRADITION AND IS AVAILABLE TO BE PICKED UP AND RETURNED TO PENNSYLVANIA.

CROWN FAXED A COPY OF THE "CONSENT TO WAIVE EXTRADITION" FORM TO THIS STATION. A NOTE AT THE BOTTOM OF THE FORM ADVISED CALLING THE MONTGOMERY COUNTY DETENTION CENTER, 240-777-9730, TO ARRANGE MITCHELL'S RELEASE.

MARTHA GAY WAS NOTIFIED OF THE INFORMATION AND SHE INFORMED SEAN SCHAFFER AT CHESTER COUNTY CENTRAL WARRANTS OF MITCHELL'S LOCATION. SCHAFFER IS IN CHARGE OF MAKING ALL OF THE NECESSARY ARRANGEMENTS TO HAVE MITCHELL RETURNED TO PENNSYLVANIA.

| **SUPPLEMENTAL #8** | | MDG | 6/28/2000 | MDG | 6/28/2000 | N |
|---|---|---|---|---|---|---|

ALL OTHER OFFENSES

| WSIRF-01 | UT-00-03452 | 5/26/2000 | ☐ APPROVED | BY: | ON: | PAGE | 6 |
|---|---|---|---|---|---|---|---|

**Uwchlan Township Police Dept.**

UT-00-03452    5/26/2000

OFFICER: 131    OBENSKI, WARREN KEITH

☑ Investigation ☐ Accident ☑ Arrests Made ☐ Suspects

**Incident Report Form**

INCIDENT #08-060-03452
OFFICER M. GALE
SUPPLEMENT #8
6/28/00

ON THIS DATE, AT 7:30 P.M., I SPOKE TO CONSTABLE FAGELLY BY PHONE. HE ADVISED THAT HE PICKED GREGG MITCHELL UP IN MARYLAND TODAY AND TOOK HIM IN FRONT OF JUDGE BRUNO IN WEST CHESTER FOR PRELIMINARY ARRAIGNMENT. MITCHELL WAS REMANDED TO CHESTER COUNTY PRISON ON $7,500 CASH BAIL. FAGELLY BELIEVES THE PRELIMINARY HEARING DATE IS JULY 18TH. I CALLED RHONDA MORRIS AND ADVISED HER OF THIS INFORMATION.

CJC     8/1/2000     CJC     8/2/2000     N

All Other Offenses
Incident# 08-050-3452
Sgt. C.J. Crawford
Supplement# 9
1 Aug 2000

On this date at 11:00 am, I re-interviewed Rhonda Morris at this office. When asked about her relationship to Mitchell, Morris told me that she had dated him for about three weeks at the end of their training class. When asked, Morris stated that she broke up with Mitchell because he was pushy and controlling. Morris said that Mitchell would call her phone all hours of the day and night checking on her. Morris said in spite of the relationship they remained casual friends. Morris said that she had even entrusted Mitchell with some of her photographs to set up a web site for Morris.

When asked about Mitchell's sexual assault on 10 Apr 2000 at the Fairfield Inn, Morris told me that Mitchell had used a ruse to get her to the Inn ( see Morris' statement/Obenski report). Morris said at the time of the incident she was wearing jeans and a black, buttoned blouse. While standing at the corner of the bed, Morris said that Mitchell used both of his hands and pushed Morris' shoulder forcing Morris down onto the hotel bed. Morris said that Mitchell fell on top of her. Mitchell started to tell Morris that she knows she want's it , you know you love me and come on baby. Morris said that Mitchell then tried to kiss her on the lips. Morris said that she kept turning her head, squiggled around  and telling him to get off of her. Morris said that Mitchell then leaned on her right shoulder, pinning her arm and body to the bed. Mitchell then reached down unbuttoned Morris' jeans and pulled causing the zipper to come down. Mitchell then reached his hand under Morris' panties and got his hand as far as her pubic hair. Morris said that she was able to push his hand away. Morris said that Mitchell then pulled on her blouse which caused the blouse to open approximately two buttons down. Morris then said that Mitchell grabbed her breast on the outside of her blouse.

Morris then said that she raised her voice, told  Mitchell to get off of her and at this point was able to push him back. Morris said that Mitchell got up and told Morris that I knew you

| Uwchlan Township Police Dept. | UT-00-03452 | 5/26/2000 |
|---|---|---|
| | OFFICER: 131 | OBENSKI, WARREN KEITH |

☑ Investigation ☐ Accident ☑ Arrests Made ☐ Suspects

**Incident Report Form**

wouldn't have sex or sleep with him ( Morris wasn't sure which phrase he used).  Mitchell then asked Morris if she had seen Howard lately. Morris asked if he had been reading her electronic mails and Mitchell grabbed Morris very hard and sat her on a chair near the night stand. On the night stand was Mitchell's laptop computer, it was already turned on. Mitchell then signed onto AOL and then entered Morris' password. Morris said she looked at the screen and saw her electronic mail mailbox. Morris said that he then laid his hand on her shoulder and at that time she became very frightened due to previous statements made by Mitchell to the effect that it would be easy Incident# 08-050-3452
Supplement# 9
Page 2 of 2

for Mitchell to kill her. Mitchell said that even though she fucked up but  that they could still make the relationship work. Morris said that she went along with whatever he said at this point to avoid Mitchell from becoming upset.

Since Mitchell's arrest, Morris said that she has received hang up calls at her residence. Morris said that Mitchell calls from his cellular phone. The last number Morris had for Mitchell was a Sprint assigned number, 610/602-7101. Although Morris never saw same, Morris said that Mitchell has told her that he carries a pistol in his car in case of problems. Morris said that Mitchell gets angry if you don't agree with him and that he becomes very aggressive if he has been drinking.

I then asked Morris to contact her internet service provider and ask them if they can provide the date, time and person accessing her electronic mail account.

| Supplement# 10 | | CJC | 8/4/2000 | CJC | 8/4/2000 | N |
|---|---|---|---|---|---|---|

All Other Offenses
Incident# 08-050-3452
Sgt. C.J. Crawford
Supplement# 10
4 Aug 2000

On this date at 8:45 am, I received a phone call from Rhonda Morris. Morris stated that she had talked to Ray Stackhouse from US Airways and he needed to speak to the investigating officer in this case. Morris stated that she talked to American On-line Security at 888/265-8004. The staff at AOL Security told Morris that they could not release any information to her that a police officer must call.

At 9:00 am, I called Stackhouse at US Airways. After receiving no answer, I left a message for Stackhouse to return my call.  At 9:15 am, I called AOL Security. Their representative told me that someone from their legal department would get back to me.

| Supplement# 11 | | CJC | 8/14/2000 | CJC | 9/13/2000 | N |
|---|---|---|---|---|---|---|

All Other Offenses

| WSIRF-01 | UT-00-03452 | 5/26/2000 | ☐ APPROVED BY: | ON: | PAGE 8 |
|---|---|---|---|---|---|

**Uwchlan Township Police Dept.**

UT-00-03452    5/26/2000

OFFICER: 131    OBENSKI, WARREN KEITH

☑ Investigation ☐ Accident ☑ Arrests Made ☐ Suspects

**Incident Report Form**

Incident# 08-050-3452
Sgt. C.J. Crawford
Supplement# 10
14 Aug 2000


On this date at 1:00 pm, I spoke to Karen of the American On Line Complinance Section.
Karen told me that AOL Securtity could provide the internet provider connection log data for
Morris screen name provided we could give her a date and time of the suspected intrusion.
I told Karen that I was only sure of 10 April 2000. Karen sated that they can only complete an
IP history within the last ninety days.

I called and gave ADA beth Pitts and Rhonda Morris this information.

# EXHIBIT "B"

STATEMENT - RHONDA MORRIS   RE: GREGG MITCHELL

I DROPPED GREGG MITCHELL OFF AT THE FAIRFIELD INN ON ROUTE 100 AND 113 EARLY AFTERNOON SOMETIME IN LATE APRIL OR EARLY MAY. ABOUT A HALF AN HOUR TO 40 MINS. LATER I WAS HOME CHECKING MY E-MAIL AND HE INSTANT MESSAGED ME CLAIMING TO HAVE AN APPENDIX ATTACK. I TOLD HIM SEVERAL TIMES TO JUST CALL THE AMBULANCE BUT HE SAID HE DIDN'T WANT TO AND FINALLY WROTE " WHAT ARE YOU GOING TO DO LET ME DIE?" I RELUCTANTLY DROVE TO HIS HOTEL. I THINK IT WAS ROOM 265. THIS WAS ABOUT AN HOUR OR MORE SINCE THE TIME I DROPPED HIM OFF (ABOUT 5:00). WHEN I SHOWED UP HE HAD HIS HAND AT HIS SIDE AND SAID HE WAS IN ALOT OF PAIN BUT NO LONGER THOUGHT IT WAS AN APPENDIX ATTACK. I ASKED IF HE WANTED ME TO TAKE HIM TO THE HOSPITAL AND HE SAID NO. HE FORCED ME TO THE BED AND TRIED TO MAKE ME HAVE SEX WITH HIM. WHEN I REFUSED HE STARTED GETTING LOUD AND BELIGERENT. HE ASKED ME HOW HOWARD WAS (HOWARD WAS A FRIEND OF MINE WHO I MAINTAINED CONTACT WITH VIA E-MAIL) I SAID FINE WHY DO YOU ASK. HE SAID HE KNEW HE WAS DOING FINE AND THAT I HAD STILL BEEN IN TOUCH WITH HIM. I ASKED IF HE WAS READING MY E-MAIL AND HE SAID HE " I'VE BEEN READING YOUR E-MAIL." HE STARTED TO GET LOUD WITH ME AGAIN, CALLING ME A WHORE AND A SLUT, ETC..... I TRIED TO LEAVE AND HE STOOD IN FRONT OF ME AND I STARTED RAISING MY VOICE SAYING " I WANT TO LEAVE, I AM NOT STAYING HERE. LET ME GO", ETC..... THE HOUSEKEEPERS KNOCKED BUT HE SAID EVERYTHING WAS OKAY. I DIDN'T SPEAK BECAUSE I WAS AFRAID OF HIM BY THIS TIME. HE FORCED ME INTO THE CHAIR, GRABBING ME AROUND MY BICEPS ON EACH ARM. THE CHAIR WAS FACING THE NIGHTSTAND WHERE HIS LAPTOP WAS. IF YOU WERE FACING THE BED THE NIGHTSTAND WOULD HAVE BEEN ON THE RIGHTHAND SIDE. HE PROCEEDED TO SIGN ON TO MY AOL ACCOUNT. HE SHOWED ME E-MAIL I HAD NOT RECIEVED BECAUSE HE SIGNED ON BEFORE I COULD READ IT. HE STOOD BEHIND ME WITH HIS HAND ON ME AND I FELT THAT IF I TRIED TO LEAVE AT THIS POINT HE WOULD HAVE HARMED ME. HE AGAIN STARTED TELLING ME WHAT A WHORE I WAS AND WHY WAS I PLAYING HIM. I TOLD HIM I WASN'T AND THAT HOWARD WAS JUST A FRIEND AND I HADN'T SEEN HIM FOR MANY MONTHS. I DIDN'T OWE HIM AN EXPLAINATION BUT IT SEEMED TO KEEP HIM CALMED DOWN IF I SAID I WAS IN THE WRONG AND WAS SORRY. HE REMAINED CALM AS LONG AS I AGREED WITH WHAT HE SAID. HE HAD CALMED DOWN AND SAID HE WANTED THINGS TO WORK WITH US AND THAT WE COULD WORK THROUGH THIS. HE WAS SITTING ON THE BED ACROSS FROM ME BY NOW. I SAID THINGS THAT WOULD KEEP HIM FROM GETTING UPSET. LIKE WE CAN TALK ABOUT IT AND YES I CARE ABOUT YOU TOO. BUT TOLD HIM I WANTED TO LEAVE.HIS ROOM. HE LET ME GO AND I WENT BACK HOME. HE CALLED ME AT HOME AND SAID HOW SORRY HE WAS AND HE PROMISED TO NEVER PUT HIS HANDS ON ME AGAIN AND TOLD ME HE LOVED ME. HE ASKED IF I COULD PLEASE TAKE HIM TO THE AIRPORT THE NEXT DAY AND I AGREED TO DO IT. I NOTICED WHILE I WAS GETTING READY TO TAKE HIME THAT I HAD FINGERPRINT SIZED BRUISES ON MY ARMS. I ALMOST DID NOT TAKE HIM BUT I KNEW HE WAS ABLE TO ACCESS MY COMPUTER AND AOL SYSTEM AND I THOUGHT IF I DIDN'T TAKE HIM HE WOULD DO SOMETHING TO HURT ME ON THE INTERNET(WHICH HE HAS SINCE DONE , I REALIZE NOW I JUST DELAYED HIS REACTION BRIEFLY) I DIDN'T SPEAK ON THE WAY TO THE AIRPORT SIMPLY A GOOD-BYE. HE SAID HE HAD A RIGHT TO BE UPSET AND I DIDN'T REALLY CARE WHAT HE SAID AS LONG AS HE STAYED CALMED DOWN. I DROPPED HIM AT DEPARTURES IN FRONT OF THE AIRPORT AND INTENDED TO NOT SPEAK TO HIM OR SEE HIM AGAIN.
AT THIS POINT IN TIME THE HARASSMENT CONTINUES AS IT DID THE NIGHT I DROPPED HIM OFF. REPEATED PHONE CALLS, STEALING THE PASSWORD TO MY AOL ACCOUNT ON MY COMPUTER, FRAUDULENTLY OPENING A HOTMAIL ACCOUNT IN MY NAME AND SENDING E-MAILS TO PEOPLE FROM MY ADDRESS BOOK THE LIST OF VIOLATIONS GOES ON AND ON.
I DID NOT FILE CHARGES WHEN THE INCIDENT HAPPENED BECAUSE I THOUGHT HE WOULD JUST GO AWAY AND WE WORK FOR THE SAME COMPANY SO I REALLY DIDN'T

WANT TO CAUSE PROBLEMS AT WORK AND EVEN THOUGH HE PUT ME IN FEAR FOR MY
SAFETY, DID NOT REALIZE HE HAD COMMITED A CRIME.

# EXHIBIT "C"



Page: 1
Date: 5/27/00

**PHILADELPHIA/EXTON FAIRFIELD INN**
**5 NORTH POTTSTOWN PIKE**
**EXTON, PA 19341**
**610-524-8811**

Arrival: 4/10/00
Departure: 4/11/00

Guest Name: MITCHELL, GREG
Address:

Mbr. ID:
Level:

Room: 205
Folio Id: 166
Plan: REGB

| Date | Description | Reference | Charges | Credits | Balance |
|---|---|---|---|---|---|
| 4/10/00 | Long Distance | 6102330511/205 13:07 0:01:00 SR | $2.10 | $0.00 | $2.10 |
| 4/10/00 | Long Distance | 6103823600/205 13:08 0:37:00 SR | $13.86 | $0.00 | $15.96 |
| 4/10/00 | Long Distance | 6102330511/205 13:49 0:02:00 SR | $2.43 | $0.00 | $18.39 |
| 4/10/00 | Long Distance | 6102330511/205 13:50 0:02:00 SR | $2.43 | $0.00 | $20.82 |
| 4/10/00 | Long Distance | 6105304032/205 13:54 0:09:00 SR | $6.57 | $0.00 | $27.39 |
| 4/10/00 | Long Distance | 6105304032/205 14:04 0:05:00 SR | $4.47 | $0.00 | $31.86 |
| 4/10/00 | Long Distance | 6105170077/205 14:09 0:02:00 SR | $2.52 | $0.00 | $34.38 |
| 4/10/00 | Long Distance | 6102330511/205 14:17 0:02:00 SR | $2.43 | $0.00 | $36.81 |
| 4/10/00 | Long Distance | 6105304032/205 14:19 0:08:00 SR | $6.06 | $0.00 | $42.87 |
| 4/10/00 | Long Distance | 6102330511/205 14:27 0:02:00 SR | $2.43 | $0.00 | $45.30 |
| 4/10/00 | Long Distance | 6102330511/205 14:35 0:02:00 SR | $2.43 | $0.00 | $47.73 |
| 4/10/00 | Long Distance | 6105170077/205 14:40 0:01:00 SR | $2.16 | $0.00 | $49.89 |
| 4/10/00 | Long Distance | 6107822531/205 15:14 0:01:00 SR | $2.37 | $0.00 | $52.26 |
| 4/10/00 | Long Distance | 6102955400/205 15:15 0:02:00 SR | $2.91 | $0.00 | $55.17 |
| 4/10/00 | Long Distance | 6107822531/205 15:17 0:01:00 SR | $2.37 | $0.00 | $57.54 |
| 4/10/00 | Long Distance | 6102955400/205 15:18 0:02:00 SR | $2.91 | $0.00 | $60.45 |
| 4/10/00 | Long Distance | 6105341309/205 18:04 0:02:00 SR | $2.28 | $0.00 | $62.73 |
| 4/10/00 | Long Distance | 6109429345/205 19:23 0:02:00 SR | $1.30 | $0.00 | $64.03 |
| 4/10/00 | Long Distance | 6105304032/205 19:33 0:02:00 SR | $2.58 | $0.00 | $66.61 |
| 4/10/00 | Long Distance | 6105304032/205 20:51 0:03:00 SR | $3.00 | $0.00 | $69.61 |
| 4/10/00 | Long Distance | 6105304032/205 21:17 0:31:00 SR | $14.91 | $0.00 | $84.52 |
| 4/10/00 | Long Distance | 6107822531/205 21:49 0:01:00 SR | $2.16 | $0.00 | $86.68 |
| 4/10/00 | Long Distance | 6102955400/205 21:49 0:02:00 SR | $2.58 | $0.00 | $89.26 |
| 4/10/00 | Long Distance | 6107822531/205 21:51 0:01:00 SR | $2.16 | $0.00 | $91.42 |
| 4/10/00 | Long Distance | 6102955400/205 21:52 0:07:00 SR | $4.71 | $0.00 | $96.13 |
| 4/10/00 | Long Distance | 6105304032/205 22:44 0:02:00 SR | $2.25 | $0.00 | $98.38 |
| 4/10/00 | Long Distance | 6102955400/205 22:47 0:03:00 SR | $2.55 | $0.00 | $100.93 |
| 4/10/00 | Regular Room Charge | Room 205 | $69.00 | $0.00 | $169.93 |



**Page:** 2
**Date:** 5/27/00

**PHILADELPHIA/EXTON FAIRFIELD INN**
**5 NORTH POTTSTOWN PIKE**
**EXTON, PA 19341**
**610-524-8811**

**Arrival:** 4/10/00
**Departure:** 4/11/00

**Guest Name:** MITCHELL, GREG
**Address:**

**Mbr. ID:**
**Level:**

**Room:** 205
**Folio Id:** 166
**Plan:** REGB

| Date | Description | Reference | | | |
|------|-------------|-----------|---|---|---|
| 4/10/00 | Occupancy Tax | Room 205 | $1.38 | $0.00 | $171.31 |
| 4/10/00 | State Tax | Room 205 | $4.14 | $0.00 | $175.45 |
| 4/11/00 | Long Distance | 6105304032/205 8:02 0:01:00 SR | $2.37 | $0.00 | $177.82 |
| 4/11/00 | Long Distance | 6105304032/205 8:03 0:02:00 SR | $2.91 | $0.00 | $180.73 |
| 4/11/00 | Long Distance | 6102955400/205 8:05 0:04:00 SR | $3.96 | $0.00 | $184.69 |
| 4/11/00 | Master Card | 5463861011342114 | $0.00 | -$184.69 | $0.00 |

**Total Folio Page 1**  $0.00

X _____

Cardholder acknowledges receipt of goods and/or services in the amount of the total shown above
and agrees to perform the obligations and terms in the cardholder agreement with the seller.

# EXHIBIT "D"

# WARREN OBENSKI

## JUNE 25, 2003

### Page 1 to Page 62

DIAMOND COURT REPORTING
(856) 232 6903

## Page 17

(1)    Q.   No?

(2)    A.   No.

(3)    Q.   I will show you a document we'll mark

(4) this as Obenski-1 and ask if you can identify it?

(5)    A.   Yes, I can.

(6)    Q.   What is this?

(7)    A.   It's appears to be a photocopy of

(8) page number two of a Uwchlan Township Police

(9) Department incident report.

(10)   Q.   I will show you also a document, and

(11) we'll have these two documents marked collectively

(12) as Obenski-1. I'll ask you if that's the first

(13) page?

(14)   A.   It appears to be the first page,

(15) photocopy of the first page.

(16)   Q.   Could you read through that report,

(17) Officer, please?

(18)   A.   (Pause.)

(19)   MR. KARAMESSINIS:    This is a two-page

(20)      report that we will be collectively marked?

(21)   MR. SAVAGE:    Yes.

(22)   BY MR. SAVAGE:

(23)   Q.   Have you read it, Officer?

(24)   A.   Yes, I have.

## Page 18

(1)    Q.   Does this refresh your recollection

(2) regarding the investigation of Mr. Mitchell?

(3)    A.   Only partially. There are several

(4) pages still missing.

(5)    Q.   There are several pages missing from

(6) this document?

(7)    A.   Yes. This it not my complete report.

(8) It's continued on Page 3. There's a comment, by

(9) telephone, so there's more to this report.

(10)   (Brief discussion off the record.)

(11)   MR. KARAMESSINIS:    We've agreed that

(12)      Obenski-1 is going to be four pages of a

(13)      police report to which there may be other

(14)      supplementals. But we're calling these four

(15)      pages Obenski-1; is that right?

(16)   MR. SAVAGE:    Yes.

(17)   (Obenski-1 was marked by the court

(18) reporter for identification.)

(19)   (Gregory Mitchell enters the room.)

(20)   BY MR. SAVAGE:

(21)   Q.   Officer Obenski, you have indicated

(22) on the record that this appears to be your report

(23) although it's not the complete report, that there

(24) might be some supplemental comments?

## Page 19

(1)    A.   There are other supplements to this

(2) report.

(3)    Q.   Who would have made those

(4) supplements?

(5)    A.   I would have to look at the sheet to

(6) tell you.

(7)    Q.   Was this the sum total of the

(8) information that you used to prepare the Affidavit

(9) of Probable Cause?

(10)   A.   No, it's not.

(11)   Q.   What other information did you use to

(12) prepare the Affidavit of Probable Cause?

(13)   A.   A written statement provided by

(14) Rhonda Morris to myself.

(15)   MR. SAVAGE:    I will have this

(16)      document marked as Gale-3.

(17)   MR. KARAMESSINIS:    Gale-3 or

(18)      Obenski-3?

(19)   BY MR. SAVAGE:

(20)   Q.   I'm sorry. Obenski-3, and ask you if

(21) you can identify that?

(22)   MR. KARAMESSINIS:    I think we're

(23)      still on Obenski-2 because this is 1, isn't

(24)      it?

## Page 20

(1)    MR. SAVAGE:    Okay. Obenski-2.

(2)    (Obenski-2 was marked by the court

(3) reporter for identification.)

(4)    BY MR. SAVAGE:

(5)    Q.   Is that the statement?

(6)    A.   No, it's not.

(7)    Q.   Did you provide the statement to

(8) Mr. Karamessinis?

(9)    A.   Yes, I did. Additionally I used the

(10) Fairfield Inn log, which your arm is right on,

(11) during the investigation.

(12)   MR. KARAMESSINIS:    I gave it to you

(13)      but I'll make a copy it of. It's this one.

(14)   MR. SAVAGE:    Can we have this marked?

(15)   MR. KARAMESSINIS:    That's out of my

(16)      stuff but that's fine, I'll go make a copy

(17)      of it.

(18)   (Brief discussion off the record.)

(19)   (Obenski-3 was marked by the court

(20) reporter for identification.)

(21)   BY MR. SAVAGE:

(22)   Q.   Do you identify that as Rhonda

(23) Morris' statement?

(24)   A.   That is the statement she provided to

## Page 33

(1) ·complaint deals with stalking?

(2)    A.    That's correct.

(3)    Q.    And there's a separate count for

(4) indecent assault, actually two separate counts for

(5) indecent assault?

(6)    A.    Yes.

(7)    Q.    So are you saying that the indecent

(8) assault and the stalking charges all relate to what

(9) occurred at the Fairfield Inn?

(10)    A.    That's correct.

(11)    Q.    And the stalking and harassment

(12) counts don't deal at all with telephone calls?

(13)    A.    No. All the charges on the police

(14) criminal complaint, the six charges, are all

(15) related to what happened at the Fairfield Inn.

(16)    Q.    Are you aware that at the preliminary

(17) hearing the district attorney asked for and was

(18) granted a motion to amend the complaint to add

(19) multiple counts of harassment by communication as a

(20) result of Ms. Morris' report. Are you aware of

(21) that?

(22)    MR. KARAMESSINIS:    Object to the

(23)     form.

(24)    THE WITNESS:    I became aware at some

## Page 34

(1)     point once I was served with this lawsuit,

(2)     prior to that, no.

(3)    BY MR. SAVAGE:

(4)    Q.    And you know that the motion and the

(5)     grant of that motion was a result of the

(6)     information that was provided in her statement?

(7)    MR. KARAMESSINIS:    Object to the

(8)     form. I don't know how he would know that.

(9)    MR. SAVAGE:    Well, he can answer the

(10)     question. He said he knows. He said he

(11)     became aware of it.

(12)    MR. KARAMESSINIS:    No, he said he

(13)     became aware of —

(14)    THE WITNESS:    Aware of the charges.

(15)    MR. KARAMESSINIS:    — the charges

(16)     being amended not the basis for them being

(17)     amended. You're telling him that they were

(18)     amended because of the statement he

(19)     prepared. I don't know if he knows that or

(20)     even if that's true.

(21)    THE WITNESS:    I don't know that.

(22)    BY MR. SAVAGE:

(23)    Q.    I'm referring to that statement

(24) again. The first sentence, sir, Rhonda Morris says

## Page 35

(1)    that I dropped Greg Mitchell off at the Fairfield

(2)    Inn on Route 100 and 113 early afternoon sometime

(3)    in late April or early May?

(4)    A.    Yes.

(5)    Q.    That's what she said?

(6)    A.    That's what written.

(7)    Q.    That's what written?

(8)    A.    Yes.

(9)    Q.    But yet the charges are for an

(10)    incident that occurred on April 10 of 2000.

(11)    A.    Okay. The question?

(12)    Q.    You would recognize that there is an

(13)    inconsistency there of what she reported in the

(14)    statement and the date that you actually used to

(15)    charge Mr. Mitchell?

(16)    A.    She provided some time in late April

(17)    early May. We determined that the incident

(18)    occurred on 4-10.

(19)    Q.    So that inconsistency is not enough

(20)    to cause you to hesitate as to whether or not

(21)    there's probable cause?

(22)    A.    Additional investigation showed that

(23)    there were other facts that supported her claim.

(24)    Q.    What other facts?

## Page 36

(1)    A.    The register from the Fairfield Inn

(2)    and also had some consistencies along with her

(3)    statement. The Fairfield Inn incident showed that

(4)    Greg Mitchell did in fact register a room on 4-10.

(5)    Q.    Were you aware that Greg Mitchell

(6)    also registered a room with Best Western the day

(7)    after, April 11th, were you aware of that?

(8)    A.    No, I'm not.

(9)    Q.    Did you subsequently learn that at

(10)    all?

(11)    A.    No.

(12)    Q.    Officer, is there a written policy

(13)    with regard to fugitive warrants, preparing

(14)    fugitive warrants?

(15)    A.    No, there's not.

(16)    Q.    How did you learn how to do that?

(17)    A.    Police academy training, field

(18)    training and on-the-job training.

(19)    Q.    What constitutes a fugitive in your

(20)    view?

(21)    A.    Someone who is wanted for a crime and

(22)    is not apprehended at that point after a warrant is

(23)    issued.

(24)    Q.    Would the person have to receive

BSA

## Page 41

(1) Chester in the courthouse as the Prothonotary, and

(2) a judge, a magistrate signs an arrest warrant for

(3) him, would you, because he lives in the State of

(4) Delaware, would you prepare an Affidavit of

(5) Probable Cause and ask a court to declare him a

(6) fugitive?

(7) MR. KARAMESSINIS:    Object to the form

(8) of the question. It implies -- first of all

(9) you're asking for speculation. And number

(10) two, you're implying that he's asking the

(11) court to declare someone a fugitive and

(12) that's an unfair --

(13) MR. SAVAGE:    I'm trying to find a

(14) way to get the officer to talk about the

(15) variables that go into his decision making

(16) as to whether or not he's going to prepare

(17) an Affidavit of Due Diligence --

(18) MR. KARAMESSINIS:    Why don't you ask

(19) him what he did in this case and then you

(20) can back into that question. It might be a

(21) faster way to get through it, it's your

(22) deposition.

(23) MR. SAVAGE:    I'll try it that way.

(24) BY MR. SAVAGE:

## Page 42

(1) Q.    What information did you use to reach

(2) a conclusion that the proper way to handle the

(3) apprehension of Mr. Mitchell was to prepare a

(4) fugitive warrant?

(5) A.    From what the district attorney's

(6) office told me.

(7) Q.    And who did you speak with in the

(8) district attorney's office?

(9) A.    I believe it was Martha Gay.

(10) Q.    And did she contact you or did you

(11) contact her?

(12) A.    I believe I contacted her.

(13) Q.    And why did you contact her?

(14) A.    To ask her what the best way would be

(15) to get Mr. Mitchell into custody in the State of

(16) Pennsylvania.

(17) Q.    What did you tell her to have her

(18) form some advice?

(19) A.    I don't have any particular

(20) recollection of the phone conversation but I would

(21) have probably told her the circumstances regarding

(22) this incident that he lived out of the state.

(23) Q.    That he lived out of the state.

(24) Would you have told her he works out of state as

## Page 43

(1) well?

(2) A.    I don't know.

(3) Q.    Does a work place make a difference

(4) in terms of whether or not you would ask someone

(5) whether or not to declare someone a fugitive?

(6) A.    Yes.

(7) Q.    So what was your understanding about

(8) Mr. Mitchell's work place?

(9) A.    That he traveled for U.S. Air. He

(10) would travel from location to location.

(11) Q.    And how did you get that information?

(12) A.    I believe I talked to someone from

(13) U.S. Air and also from Ms. Morris.

(14) Q.    From Ms. Morris. And Ms. Morris is

(15) also a flight attendant?

(16) A.    Right, at that time.

(17) Q.    I'm sorry. Did there come a point in

(18) time that you learned that Mr. Mitchell was a fight

(19) attendant?

(20) A.    Yes.

(21) Q.    Do you recall who you spoke with at

(22) U.S. Air?

(23) A.    I believe it was Ray Stackhouse,

(24) however, I'm not positive. It says left a message

## Page 44

(1) for Ray Stackhouse, corporate security for U.S.

(2) Airways, Philadelphia.

(3) Q.    Do you remember having a

(4) conversation with him?

(5) A.    I don't have any recollection if I

(6) did or not. I wouldn't remember.

(7) Q.    Do you recall any questions that you

(8) asked Mr. Stackhouse?

(9) A.    I don't have any recollection of a

(10) conversation if I had one.

(11) Q.    So are you saying, Officer, that the

(12) sum total of your investigation is within the

(13) corners of your report?

(14) A.    And Rhonda Morris' statement and the

(15) room register for the Fairfield Inn.

(16) MR. KARAMESSINIS:    Along with the

(17) criminal complaint and the Affidavit of

(18) Probable Cause. You're not trying to

(19) exclude that from this, are you?

(20) MR. SAVAGE:    No.

(21) BY MR. SAVAGE:

(22) Q.    Aside from this statement did you ask

(23) Rhonda Morris any questions to test her credibility

(24) about this statement?

## Page 45

(1)     A.    I don't understand the question.

(2)     Q.    Did you ask her any questions at all

(3)  about her statement?

(4)     A.    Just whether it was true and

(5)  accurate.

(6)     Q.    And she would have said yes? If she

(7)  would have said no would you have proceeded with

(8)  this?

(9)     A.    Of course not.

(10)    Q.    We have to assume she told you, yes,

(11)  it's true and accurate?

(12)    A.    I don't know.

(13)    Q.    You don't know whether she told you

(14)  it was true and accurate?

(15)    A.    I don't have any recollection of it.

(16)  If you want to assume that. I don't remember. I'm

(17)  not going to assume something that I don't have a

(18)  recollection of.

(19)    Q.    And I'm not going to assume it for

(20)  you, Officer. In the course of your business of

(21)  taking statements from people, at the end of it do

(22)  you ask people whether the statement is true and

(23)  accurate?

(24)    A.    Yes.

## Page 46

(1)     Q.    So is it fair to say in this instance

(2)  you would have asked the same thing?

(3)     A.    I'm not going to speculate. I don't

(4)  have any recollection of this incident besides

(5)  what's in front of me.

(6)     MR. KARAMESSINIS:    But he is saying

(7)       as a policy and practice —

(8)     THE WITNESS:    I usually — I ask

(9)       everyone to make sure. I also advise them

(10)      that if this is a false statement they could

(11)      also be charged.

(12)    BY MR. SAVAGE:

(13)    Q.    In that statement does she — my

(14)  recollection is that she told you that she took

(15)  Greg Mitchell back to the airport the next day. In

(16)  the statement if you read that she stated —

(17)    A.    She did take him to the airport the

(18)  following day.

(19)    Q.    Did she tell you that? Do you have a

(20)  recollection of her telling you that he took a

(21)  plane and left?

(22)    A.    I don't have any recollection of

(23)  that.

(24)    Q.    Do you have a recollection of asking

## Page 47

(1)  her where she was the night before this incident?

(2)     A.    No, I don't have any recollection.

(3)     Q.    So, Officer, again, what was the

(4)  reason why you would have indicated that

(5)  Mr. Mitchell would flee or escape or avoid

(6)  apprehension if notified?

(7)     A.    Again that would have been a

(8)  statement from Ms. Morris.

(9)     Q.    And did you have any collaborating

(10)  evidence to support that statement from her to you?

(11)    A.    I went on her statement.

(12)    Q.    You just went strictly on her

(13)  statement?

(14)    A.    Yes. I didn't call him and ask him

(15)  if he would flee and him tell me yes.

(16)    Q.    Do you think he would tell you yes?

(17)    MR. KARAMESSINIS:    Objection. I

(18)      don't know how he would know the answer to

(19)      that.

(20)    BY MR. SAVAGE:

(21)    Q.    Let me ask you this. You began to

(22)  talk about why it is that you designate suspects as

(23)  fugitives and then you started to talk about

(24)  variables. Are you able to identify any variables

## Page 48

(1)  that you would use to determine whether or not

(2)  someone would be a candidate for a fugitive or

(3)  likely to flee or would appear in the jurisdiction

(4)  and surrender?

(5)     A.    I would say yes.

(6)     Q.    What are the variables?

(7)     A.    For instance the report of a bad

(8)  check, a case for $10,000. I would call the

(9)  suspect and he could come in and give me an

(10)  interview and admit to it and I would type a

(11)  warrant up because it's a felony. He would have to

(12)  be arraigned in front of a judge. He would stay

(13)  there and go with me.

(14)     Additionally, if someone lived in the

(15)  state they don't need to be made a fugitive from

(16)  justice on warrants because that warrant is good in

(17)  the Commonwealth of Pennsylvania.

(18)    Q.    What about if they worked in the

(19)  state.

(20)    A.    If we knew that we would possibly

(21)  pick them up on a regular warrant.

(22)    Q.    So was there anything about

(23)  Mr. Mitchell other than what Ms. Morris told you

(24)  that caused you not to treat Mr. Mitchell that way,

BSA

## Page 53

(1) checked other because I needed two lines, I wrote

(2) in the comment section for other.

(3)    Q.    By that time had you attempted to

(4) contact Mr. Stackhouse?

(5)    A.    I don't know what date this was

(6) prepared so I don't know.

(7)    Q.    Your signature was notarized on June

(8) the 8th?

(9)    A.    That's the judge's. The day the

(10) judge signed it.

(11)    Q.    How much time ordinarily lapses

(12) between you preparing affidavits and the judge's

(13) signature?

(14)    A.    I don't know.

(15)    Q.    If Mr. Stackhouse told you that

(16) Mr. Mitchell will have a minimum 17 hour layover in

(17) Philadelphia and the time you prepared your arrest

(18) warrant would you make an effort to apprehend him

(19) in Philadelphia?

(20)    A.    Yes.

(21)    Q.    Would you do so with a fugitive

(22) warrant or regular arrest warrant?

(23)    A.    Depends on whether I had the fugitive

(24) warrant in existence or not.

## Page 54

(1)    Q.    Let's say you didn't already have the

(2) fugitive warrant prepared and you spoke with

(3) Mr. Stackhouse and said he's going to be there for

(4) at least 17 hours, and also you tell me when you

(5) want him and I'll make sure he'll be in my office

(6) or somebody's office?

(7)    MR. KARAMESSINIS:    Objection. Calls

(8)       for speculation. You can answer.

(9)    THE WITNESS:    Speculatively I'm sure

(10)       I would try.

(11)    BY MR. SAVAGE:

(12)    Q.    With a regular warrant or fugitive

(13) warrant?

(14)    A.    Doesn't matter, still a warrant for

(15) his arrest.

(16)    Q.    The first page of Gale-1 has

(17) Mr. Mitchell's race as white. Did you know his

(18) race at the time that you prepared this?

(19)    A.    No. I believed he was white.

(20)    Q.    Would Rhonda have told you he was

(21) white?

(22)    A.    I believe she would have led me to

(23) believe he was white. She didn't specifically

(24) state he was not.

## Page 55

(1)    Q.    Did you ask Mr. Stackhouse whether

(2) the company conducted an investigation of Rhonda

(3) Morris' allegations?

(4)    A.    I don't recall any phone

(5) conversations with Mr. Stackhouse.

(6)    Q.    Phone conversations or in writing, do

(7) you recall making any request to whether or not the

(8) company is to conduct an investigation?

(9)    A.    It's not in my report. I don't have

(10) any recollection of requesting that.

(11)    Q.    Do you know that Rhonda Morris

(12) retained a civil attorney and presented with the

(13) civil attorney to the Brandywine Regional Police?

(14)    A.    No, I don't know that.

(15)    MR. SAVAGE:    I don't have any further

(16)       questions.

(17)    MR. KARAMESSINIS:    I have two

(18)       questions.

(19)    BY MR. KARAMESSINIS:

(20)    Q.    At the point in which you took the

(21) arrest warrant you were aware that Mitchell resided

(22) in Maryland; is that right?

(23)    A.    That's correct.

(24)    Q.    And what was your understanding of

## Page 56

(1) the purposes for which the fugitive warrant was

(2) going to be given to you?

(3)    A.    It's my understanding that the

(4) Commonwealth of Pennsylvania warrant is good

(5) throughout the state. The only difference in

(6) making it a fugitive from justice warrant enters

(7) the defendant into what's called the National Crime

(8) Information Center, which means if he would be

(9) stopped in another state it would show that state

(10) that the subject is wanted by our department. In

(11) getting a fugitive from justice warrant what that

(12) does is also allow an extradition zone to be in

(13) place. A regular county warrant or Commonwealth of

(14) Pennsylvania warrant is good anywhere in the State

(15) of Pennsylvania.

(16)    Q.    Was the purpose of getting this as a

(17) fugitive warrant to able another state police

(18) agency or another state's local police agency to

(19) pick Mitchell up on this warrant?

(20)    A.    Yes, it was, because he resided in

(21) Maryland. Zone 1 is any state that touches

(22) Pennsylvania. A Zone 1 extradition would allow us

(23) to provide this information to the police

(24) department where Mr. Mitchell resides and have them

BSA

## Page 57

(1) serve the warrant.

(2)    Q.   And who was it who advised you that a

(3) fugitive warrant was the way to go in order to

(4) extradite Mitchell back to Pennsylvania?

(5)    A.   Martha Gay who works for the Chester

(6) County District Attorney's office, she is in charge

(7) of the fugitive unit.

(8)    MR. KARAMESSINIS:    Thanks.

(9)    MR. SAVAGE:    Just a couple questions,

(10)    Officer.

(11)    BY MR. SAVAGE:

(12)    Q.   Does a fugitive status on a suspect,

(13) if you know, more than likely mean that court would

(14) set a higher bail for release?

(15)    MR. KARAMESSINIS:    Objection to the

(16)    form.

(17)    THE WITNESS:    I have no clue. I

(18)    don't believe so. Just --

(19)    MR. KARAMESSINIS:    There's no

(20)    question pending.

(21)    MR. SAVAGE:    You can answer fully if

(22)    you'd like.

(23)    MR. KARAMESSINIS:    If you need to

(24)    supplement it go ahead.

## Page 58

(1)    THE WITNESS:    Just stated that

(2)    there's a spot on every warrant for arrest

(3)    whether it is a fugitive or not that a judge

(4)    will preset the fine or costs, not needed to

(5)    satisfy collateral which is bail, there is

(6)    none listed on this. It's up to the judge

(7)    to set the amount. From what I believe

(8)    there is a book that the judges go by to set

(9)    bail and it's based upon I believe where the

(10)    defendant lives, how long he's been at his

(11)    job, if he's married, his education, and his

(12)    likelihood of returning for trial. I don't

(13)    believe it has anything to do with if it's

(14)    stamped fugitive or not.

(15)    BY MR. SAVAGE:

(16)    Q.   But you would agree, Officer, that

(17) when you put in your Affidavit of Due Diligence

(18) that will flee it notified that you're telling the

(19) court that unless he's in handcuffs he's going to

(20) leave?

(21)    MR. KARAMESSINIS:    Object to the

(22)    form.

(23)    THE WITNESS:    I don't believe that's

(24)    what that means. That due diligence form is

## Page 59

(1)    not attached to the arrest warrant.

(2)    BY MR. SAVAGE:

(3)    Q.   What's the purpose of this form?

(4)    A.   That's required by the district court

(5) for us to have him entered as a fugitive. That

(6) paperwork stays with the court, that does not go

(7) with the warrant.

(8)    Q.   But in the last question you have

(9) essentially certified that you have a good faith

(10) belief that this person is a fugitive?

(11)    MR. KARAMESSINIS:    Objection.

(12)    MR. SAVAGE:    That's what it says

(13)    there?

(14)    MR. KARAMESSINIS:    Doesn't say that.

(15)    BY MR. SAVAGE:

(16)    Q.   I'll read it. After having made

(17) these efforts I hereby believe that the above named

(18) individual to be a fugitive. Is that what it says?

(19)    A.   That's correct.

(20)    Q.   So not withstanding the fact that you

(21) haven't contacted his employer and secured

(22) Mr. Mitchell's employment information and made an

(23) attempt to apprehend him in Philadelphia you've

(24) indicated he's a fugitive?

## Page 60

(1)    A.   This is what was needed to get him

(2) entered as a fugitive. His employment base is not

(3) in Philadelphia from what I understood.

(4)    Q.   I understand that. But wouldn't it

(5) make a difference as a flight attendant if he

(6) stayed in Philadelphia for 17 hours at a time?

(7)    A.   I don't know whether he would pick up

(8) and never choose to ever come to Pennsylvania

(9) again, I don't know that.

(10)    Q.   That's after being notified. You

(11) agreed you never notified him that there was a

(12) warrant for his arrest?

(13)    A.   I'm sure he was aware that --

(14)    MR. KARAMESSINIS:    That's not the

(15)    question.

(16)    THE WITNESS:    No, I didn't contact

(17)    him so I don't know what his mental status

(18)    was or what he would say.

(19)    BY MR. SAVAGE:

(20)    Q.   And you know that the court

(21) ultimately found him -- first of all, you know

(22) ultimately the district attorney reduced the

(23) misdemeanor charges down to summary and the court

(24) ultimately found him not guilty of the summary

# EXHIBIT "E"

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF:    CHESTER

**POLICE**
**CRIMINAL COMPLAINT**

COPY

| | |
|---|---|
| Magisterial District Number    15-2-07 | |
| District Justice Name: Hon.    STANLEY SCOTT | |
| Address:    35 E. UWCHLAN AVE.<br>SUITE 322<br>LIONVILLE, PA 19353 | COMMONWEALTH OF PENNSYLVANIA<br>VS. |
| Telephon    (610) 524-7456 | DEFENDANT<br><br>MITCHELL, GREGG<br>5 RIVIERA COURT |
| Docket No.:    CR-0000141-00 | |
| Date Filed:    6/1/00 | SILVER SPRINGS MD 20904 |
| OTN:    F 216189-1 | |

| Defendant's Race/Ethnicity | Defendant's Sex | Defendant's D.O.B | Defendant's Social Security Number | Defendant's SID |
|---|---|---|---|---|
| ☒ White    Asian    Black<br>Hispanic    Native American    Unknown | ☐ Female<br>☒ Male | 12/11/1963 | 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 | |

| Defendant's A.K.A. | Defendant's Vehicle Information: | | | Defendant's Driver's License Number |
|---|---|---|---|---|
| | Plate Number    State    Registration Sticker (MM/YY) | | | State<br>MD    M-324-288-005-942 |

| Complaint / Incident Number<br>26-050-03452 | Complaint / Incident Numbers if other Participants | UCR / NIBRS Code<br>170 |
|---|---|---|

District Attorney's Office ☐ Approved    ☐ Disapproved because: _____
(The district attorney may require that the complaint, arrest warrant affidavit, or both be approved by the attorney for the Commonwealth prior to filing.
Pa.R.Cr.P. 107.)

| (Name of Attorney for Commonwealth - Please Print or Type) | (Signature of Attorney for Commonwealth) | (Date) |
|---|---|---|

I,    OBENSKI, WARREN KEITH    131
    (Name of Affiant - Please Print or Type)

of  Uwchlan Twp Police Department    PA0152800    UT-00-03452
    (Identify Department or Agency Represented and Political Subdivision)    (Police Agency ORI Number)    (Originating Agency Case Number (OCA))
    (Officer Badge Number / I.D.)

do hereby state:   (check the appropriate box)

1.  ☒ I accuse the above named defendant who lives at the address set forth above
    ☐ I accuse the defendant whose name is unknown to me but who is described as _____

    ☐ I accuse the defendant whose name and popular designation or nickname is unknown to me and whom I have
      therefore designated as John Doe _____
    with violating the penal laws of the Commonwealth of Pennsylvania at

    FAIRFIELD INN HOTEL, 5 NORTH POTTSTOWN PIKE UWCHLAN TOWNSHIP    (Place - Political Subdivision)

    in  CHESTER    County on or about   4/10/00 BETWEEN 1400 AND 2000 HOURS

    Participants were: (if there were participants, place their names here, repeating the name of the above defendant)
    MITCHELL, GREGG

2.  The acts committed by the accused were:
    (Set forth a summary of the facts sufficient to advise the defendant of the nature of the offense charged. A citation to the statute allegedly violated,
    without more, is not sufficient. In a summary case, you must cite the specific section and subsection of the statute or ordinance allegedly violated.)

    PACC 3126(a)1 Indecent Assault M2

    IN THAT, on or about said date, THE DEFENDANT did have indecent contact with another person and/or did cause another
    person to have indecent contact with him, namely, RHONDA MORRIS, without the consent of said other person, in violation
    of Section 3126(a)(1) of the PA Crimes Code. (Misdemeanor-2nd)

    PACC 3126(a)2 Indecent Assault M2

    IN THAT, on or about said date, THE DEFENDANT did have indecent contact with another person and/or did cause another
    person to have indecent contact with him, namely, RHONDA MORRIS, by forcible compulsion, in violation of Section
    3126(a)(2) of the PA Crimes Code. (18 P.S. 3126(a)(2) - (Misdemeanor-2nd)

(Continuation of No. 2)

| Defendant's Name: MITCHELL | GREGG |
|---|---|
| Docket Number: CR-0000141-00 | F 216189-1 |



POLICE COPY
CRIMINAL COMPLAINT

PACC 2709(a)3 Harassment - Summary

IN THAT, on or about said date, THE DEFENDANT, with intent to harass, annoy or alarm another person, namely, RHONDA MORRIS, did engage in a course of conduct or repeatedly committed acts, namely GRABBING MORRIS AND THROWING HER ONTO A BED, WITH DEFENDANT ON TOP OF VICTIM which did alarm or seriously annoy such other person and which served no legitimate purpose, in violation of Section 2709(3) of the PA Crimes Code.

PACC 2709(a)1 Harassment - Summary

IN THAT, on or about said date, THE DEFENDANT, with intent to harass, annoy or alarm another person, namely, RHONDA MORRIS, did strike, shove, kick or otherwise subject such other person to physical contact, or did attempt or threaten to do the same, namely, GRABBING MORRIS BY THE SHOULDERS, AND PHYSICALLY PUSHING HER INTO A CHAIR, AND THEN HOLDING HER THERE, in violation of Section 2709(1) of the PA Crimes Code.

PACC 2709(b)1 Stalking- Summary

IN THAT, on or about said date, THE DEFENDANT, with intent to place Rhonda MORRIS in reasonable fear of bodily injury, by engaging in a course of conduct, repeatedly commits acts towards another person, under circumstances which demonstrates the above.

PACC 2709(b)2 Stalking- M1

IN THAT, on or abouth said date, THE DEFENDANT, engaged in a course of conduct and repeatedly committed acts towards another person with intent to commit substantial emotional distress to the victim Rhonda MORRIS.

5. PACC 2709(b)1 PA Crimes Code   1 count.      6. PACC 2709(b)2 PA Crimes Code   1 Count
all of which were against the peace and dignity of the Commonwealth of Pennsylvania and contrary to the Act of Assembly, or in violation of

| | Section | Subsection | | PA Statute | counts |
|---|---|---|---|---|---|
| 1. | 3126 | (a)(1) | of the | PA Crimes Code | 1 |
| 2. | 3126 | (a)(2) | of the | PA Crimes Code | 1 |
| 3. | 2709 | (a)(3) | of the | PA Crimes Code | 1 |
| 4. | 2709 | (a)(1) | of the | PA Crimes Code | 1 |

3. I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges I have made. (In order for a warrant of arrest to issue, the attached affidavit of probable cause must be completed and sworn to before the issuing authority.)

4. I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 PA. C.S. 4904) relating to unsworn falsification to authorities.

_____JUNE 1,_____, 2000       ___(Signature of Affiant) #131___

AND NOW, on this date ___JUNE 1___, 2000, I certify that the complaint has been properly completed and verified. An affidavit of probable cause must be completed in order for a warrant to issue.

___15-2-07___
(Magisterial District)          (Issuing Authority)         SITTING         SEAL

COPY

| Defendant's Name: | |
| MITCHELL | GREGG |
| Docket Number: | |
| CR 0000141 00 | F 210169-1 |



**POLICE**
**CRIMINAL COMPLAINT**

## AFFIDAVIT OF PROBABLE CAUSE

ON 5/27/00 AT APPROXIMATELY 1:35 PM, I SPOKE WITH RHONDA MORRIS, WHO STATED THAT IN MID APRIL OF 2000 SHE WAS HELD AGAINST HER WILL AT THE FAIRFIELD INN HOTEL, WHICH IS LOCATED AT 5 N. POTTSTOWN PIKE, UWCHLAN TOWNSHIP. IT WAS DETERMINED THAT THE DATE WAS APRIL 10TH 2000.

MORRIS STATED THAT THE DEFENDANT, GREGG MITCHELL, HAD CONTACTED HER BY THE INTERNET COMPUTER, TELLING HER THAT HE WAS SUFFERING FROM AN "APPENDIX ATTACK" CONVINCING MORRIS TO GO TO THE HOTEL. MORRIS HAD PREVIOUSLY DATED MITCHELL FOR TWO WEEKS IN JANUARY OF THIS YEAR, AND THEY ARE BOTH FLIGHT ATTENDANTS FOR U.S. AIRWAYS. ONCE AT THE HOTEL, MITCHELL GRABBED MORRIS, AND FORCED HER ONTO THE BED IN ROOM 206, WHERE MITCHELL WAS STAYING, AGAINST MORRIS' WILL. MITCHELL THEN STARTED TO FORCEABLY REMOVE MORRIS' CLOTHING, INCLUDING UNBUTTONING HER PANTS THEREBY HAVING INDECENT CONTACT WITH MORRIS WITHOUT HER CONSENT. MITCHELL WAS ATTEMPTING TO ENGAGE IN SEXUAL INTERCOURSE WITH MORRIS AT THIS TIME. MORRIS WAS ABLE TO KEEP FIGHTING MITCHELL OFF UNTIL HE STOPPED.

DURING THIS TIME, MITCHELL ACCUSED MORRIS OF BEING IN CONTACT WITH OTHER MALES, WHICH UPSET HIM. MITCHELL SAID THAT HE WAS READING HER E-MAILS, WHEN HE THEN GRABBED HER BY HER SHOULDER, AND FORCIBLY PLACED HER INTO A CHAIR NEXT, HOLDING HER THERE FORCIBLY, AGAINST HER WILL, RESTRAINING HER UNLAWFULLY, INTERFERING SUBSTANTIALLY WITH HER LIBERTY. MITCHELL KEPT MORRIS UNLAWFULLY IN THE ROOM AGAINST HER WILL FOR OVER ONE HOUR.

DURING THIS TIME, MITCHELL PLACED MORRIS IN FEAR OF BODILY INJURY, CAUSING SUBSTANTIAL EMOTIONAL DISTRESS BY ENGAGING IN A COURSE OF CONDUCT REPEATEDLY.

YOUR AFFIANT BELIEVES THAT MITCHELL HAS VIOLATED THE LAWS AND DIGNITY OF THIS COMMONWEALTH, AND REQUESTS THAT A WARRANT BE ISSUED AGAINST MITCHELL ON THE ABOVE LISTED CHARGES.

I, _____OBENSKI, WARREN KEITH_____, BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

_____
(Signature of Affiant)

Sworn to me and subscribed before me this ___1st___ day of ___JUNE___. _2000_

___6/1/00___ Date _____, District Justice

My commission expires first Monday of January, _____    SITTING

**SEAL**

# EXHIBIT "F"

## AFFIDAVIT OF DUE DILIGENCE
### (Unable to Locate)

COMMONWEALTH vs: _MITCHELL GREGG_____ D.O.B. _12/11/1963_

CHARGES: _Indecent Assault, Stalking, Harassment_ WARRANT TYPE _M1, M2, S_

O.T.N. _F216189-1___ DOCKET: _CR-000141-00___ CITATION: _____

    I hereby swear that I have made every effort to apprehend the above named individual by doing the following:

( ) a.  Residence of Defendant, address as stated:     Time:_____Date:_____

        _____

( ) b.  Contact the Post Office to learn whereabouts of the Defendant.    Time:_____Date:_____

( ) c.  Contact the neighbors and friends of defendant to learn whereabouts.    Time:_____Date:_____

( ) d.  Contact Telephone Company :,    Time:_____Date:_____

( ) e.  Police Dept. where Defendant Lived.    Time:_____Date:_____

( ) f.  Family of Defendant  - Name and Address:    Time:_____Date:_____

        _____

( ) g.  Chester County Prison (793-1510)    Time:_____Date:_____

( ) h.  Chester County Bail Agency (431-6886)    Time:_____Date:_____

( ) i.  Chester County Probation Dept. (431-6290)    Time:_____Date:_____

( ) j.  PA State Parole Office (447-3270)    Time:_____Date:_____

( ) k.  Entered on N.C.I.C./CLEAN    Time:_____Date:_____

(✓) l.  Other: _____    Time:_____Date:_____

Comments: _WILL FLEE IF NOTIFIED. CHESTER COUNTY D A 'S OFFIC. REQUESTED FUGITIVE FROM JUSTICE WARRANT, SO SUSPECT CAN BE EXTRIDITED FROM MARYLAND TO PA._

After having made these efforts, I hereby believe the above named individual to be a fugitive.

Sworn and subscribed before me this _8th_____ day of _JUNE_____ _2000_

Respectfully submitted;

Signature _____
Officer - Constable

_WARREN K OBENSKI #13_
Name Printed

# EXHIBIT "G"

# COMMONWEALTH OF PENNSYLVANIA

## COUNTY OF CHESTER

To any authorized person:    OFF. W. OBENSKI

In the name of the Commonwealth of Pennsylvania, you are commanded to take into custody

(Name):    DOB: 12/11/63 M WHITE
MITCHELL, GREGG
5 RIVIERA COURT

(Address):    SILVER SPRINGS, MD 20904

If the defendant be found in said Commonwealth, and bring the defendant before us at

STANLEY SCOTT

(Address):    35 E UWCHLAN AVE SUITE 322
P.O. BOX 501
LIONVILLE, PA 19353

to answer the Commonwealth or    UWCHLAN TWP POLICE
_____
(Political Subdivision)

upon the complaint or citation of    OBENSKI, OFF. WARREN
charging the defendant with    18 $3126 $$A1
INDECENT ASSAULT
and further to be dealt with according to law, and for such purposes this shall be your sufficient warrant.

Witness the hand and official seal of the issuing authority on this

1st _____ day of _____ JUNE _____ , 2000 .

_____
(Signature)    SITTING

SEAL

Magisterial District No.:    15-2-07

Amount required to satisfy sentence:
Fine: $
Costs:$
Other:$
Total:$

Citation No.:
FILED:    6/01/00
Docket No.:    CR-0000141-00
OTN:    F 216189-1

Amount needed to satisfy collateral: $

Reason for warrant:    MISDEMEANOR

COPY : SHERIFF/CONSTABLE

---

## RETURN WHERE DEFENDANT IS FOUND

By authority of this warrant

☐ I took into custody the within named

☐ He is now at liberty on bail posted
before _____

☐ In the _____ jail.

☐ before you for disposition.
☐ I accepted a guilty plea and collected
$ _____
for fine and costs.

☐ I accepted a not guilty plea and
collected $ _____
for collateral.

☐ I accepted the fine and costs due
in the amount of _____
$ _____

_____
(Signature of Officer - Name & Title)

## RETURN WHERE DEFENDANT IS NOT FOUND

After careful search, I cannot find the within named defendant

_____
SIGNATURE

_____
NAME

_____
TITLE

---

# WARRANT OF ARREST

WARRANT CONTROL NO.:
0178495

DOCKET NUMBER:
CR-0000141-00

COMMONWEALTH
OF
PENNSYLVANIA

VS.

MITCHELL, GREGG

OFFENSE DATE    4/10/00

CHARGE
18 $3126 $$A1

I acknowledge that I am voluntarily and knowingly pleading guilty. I paid to the officer the fine and costs stated in the warrant in the amount of
$ _____

_____
(Defendant's Signature)

I acknowledge that I am voluntarily and knowingly pleading not guilty. I paid to the officer the collateral for my appearance at trial stated in the warrant in the amount of
$ _____

_____
(Defendant's Signature)

Officer's costs:
Warrant _____
Miles @ _____ ¢
Commitments _____
Miles @ _____ ¢
Conveying to hearing _____
Miles @ _____ ¢
Total _____

# EXHIBIT "H"

MATTHEW GALE

JUNE 25, 2003

Page 1 to Page 34

DIAMOND COURT REPORTING
(856) 232 6903

## Page 17

(1)  and I would execute the warrant for the arrest of
(2)  that person. And I've also picked people up from
(3)  other states that had fugitive warrants.
(4)  Q.  If you can recall is there a section
(5)  in your policy manual dealing with fugitive
(6)  warrants and handling of fugitives?
(7)  A.  That I don't recall.
(8)  Q.  Have you adopted for yourself a
(9)  practice or custom in going about your work in
(10)  executing fugitive warrants?
(11)  MR. KARAMESSINIS:    I will just
(12)    object. I don't know what you mean by
(13)    executing them. But with that you can
(14)    answer if you understand.
(15)  MR. SAVAGE:    I'll rephrase.
(16)  BY MR. SAVAGE:
(17)  Q.  Actually picking up a fugitive?
(18)  A.  I'm not sure – I'm still not sure
(19)  what you mean. You have to rephrase that.
(20)  Q.  Have you as a police officer not
(21)  withstanding whether or not there's a written
(22)  policy, adopted for yourself a particular way of
(23)  taking a fugitive warrant and doing what the
(24)  fugitive warrant says, be it picking somebody up or

## Page 18

(1)  delivering something to somebody, et cetera?
(2)  MR. KARAMESSINIS:    I will object to
(3)    the form. I think it's vague. If you
(4)    understand it you can answer it.
(5)  THE WITNESS:    If I have a warrant for
(6)    someone's arrest I would serve that warrant
(7)    on the person if possible, or if I know who
(8)    was able to serve that warrant I would fax
(9)    the copy or make sure that the agency
(10)    wherever the subject may be has a copy of
(11)    the warrant. They would require that if
(12)    they were to pick them up.
(13)  BY MR. SAVAGE:
(14)  Q.  The agency?
(15)  A.  The agency serving the warrant for
(16)  me. And that's what I would require of an agency
(17)  if an outside agency had a warrant for someone in
(18)  my jurisdiction. I would require a copy of that
(19)  warrant and confirmation that that person is
(20)  wanted.
(21)  Q.  Would you consider someone in your
(22)  jurisdiction who works in your jurisdiction, would
(23)  that be someone in your jurisdiction? For
(24)  instance, let's say there's a person who resides in

## Page 19

(1)  the county of Philadelphia but he works or she
(2)  works in a business in Chester County, would you
(3)  believe you have the right to, if you have a
(4)  fugitive warrant, to pick that person up at that
(5)  place of business?
(6)  MR. KARAMESSINIS:    I'll object, it
(7)    calls for speculation, if you can answer
(8)    that in the abstract.
(9)  THE WITNESS:    I'm not sure if you
(10)    mean it's a warrant from Philadelphia for
(11)    someone within in my jurisdiction?
(12)  BY MR. SAVAGE:
(13)  Q.  Let's say it's a warrant from Wyoming
(14)  and the information is that the person lives in the
(15)  city and county of Philadelphia but works or has a
(16)  place of business in, say, Uwchlan Township, and
(17)  somehow you get the fugitive warrant with the
(18)  address of the place of business and you have the
(19)  information regarding the hours of the place of
(20)  business and the work hours of the person, would
(21)  you feel you have the authority to go pick that
(22)  person up?
(23)  MR. KARAMESSINIS:    Objection to the
(24)    form. You can answer.

## Page 20

(1)  THE WITNESS:    Yes.
(2)  BY MR. SAVAGE:
(3)  Q.  Now, as to Gregory Mitchell, do you
(4)  recall that case?
(5)  A.  I recall mostly my part in it, yes.
(6)  Q.  And what was your part?
(7)  A.  I was given instructions by
(8)  Lieutenant Pontarelli to pick up a fugitive warrant
(9)  from the District Court and ensure that it gets
(10)  served.
(11)  Q.  And did you serve it?
(12)  A.  I did not.
(13)  Q.  And why didn't you serve it?
(14)  A.  Mr. Mitchell was out of state so I
(15)  did not serve the warrant. However, I did
(16)  everything within the scope of my ability to make
(17)  sure that it did get served.
(18)  Q.  Where you say Mr. Mitchell was out of
(19)  state, you mean he lived out of state or worked out
(20)  of state or both?
(21)  A.  Both I believe.
(22)  Q.  And why do you say that?
(23)  A.  His address was in Montgomery County,
(24)  Maryland where he works. And where his employment

## Page 25

(1)    it's stated it was stamped fugitive warrant.

(2)    It was a fugitive, therefore I served a

(3)    fugitive warrant or attempted to serve it.

(4)    BY MR. SAVAGE:

(5)    Q.    So if you see a judge's signature or

(6)    magistrate's signature on the warrant, that

(7)    essentially qualifies the document for your

(8)    purposes?

(9)    MR. KARAMESSINIS:    Object to the form

(10)    of the question.  What do you mean qualifies

(11)    it?

(12)    BY MR. SAVAGE:

(13)    Q.    You testified that if it's not signed

(14)    by a judge then you won't act on it; is that right?

(15)    A.    Correct.

(16)    Q.    But if it is signed by a judge you

(17)    essentially will act on it?

(18)    MR. KARAMESSINIS:    Assuming it's

(19)    otherwise filled out.  It's got a name on it

(20)    and some other things.  Are you asking only

(21)    about the judge, like a blank sheet with a

(22)    judge's signature?  I just want to be fair

(23)    to the witness.

(24)    BY MR. SAVAGE:

## Page 26

(1)    Q.    That's what I'm asking, Officer, I'm

(2)    not trying to ask trick questions.  But what I'm

(3)    trying to establish is whether or not you do an

(4)    independent review of a fugitive warrant or warrant

(5)    for arrest, once you get it if do you check it for

(6)    specific points whether or not the judge has signed

(7)    it.  Whether for instance there's a warrant control

(8)    number on it, docket number, address of a suspect

(9)    and that sort of thing, do you check it through?

(10)    A.    Yes.

(11)    Q.    If you act on a fugitive warrant then

(12)    would it be fair to say you checked it through and

(13)    it seems to be okay with you?

(14)    MR. KARAMESSINIS:    Object to the

(15)    form.  You can answer it.  When you say act

(16)    on it —

(17)    BY MR. SAVAGE:

(18)    Q.    When you serve a fugitive warrant.

(19)    If you serve a fugitive warrant with a warrant is

(20)    it fair to say you have done that because you have

(21)    checked through the paperwork and it seems to be in

(22)    order with you?

(23)    A.    Yes.

(24)    Q.    Now, was it your job back in June of

## Page 27

(1)    2000 to receive fugitive warrants for the

(2)    department?  Was it only your job or just one of

(3)    the jobs?

(4)    A.    I'm not sure what you mean.

(5)    Q.    Were you the designated person to

(6)    receive fugitive warrants from the department in,

(7)    say, June of 2000 or were other officers involved

(8)    in that as well?

(9)    A.    Any officer could be designated to

(10)    serve a fugitive warrant.  I was designated to

(11)    serve this fugitive warrant.

(12)    Q.    I will refer you to the Criminal

(13)    Complaint, the Affidavit of Probable Cause, and the

(14)    Affidavit of Due Diligence, they were all signed by

(15)    Officer Warren Obenski; is that a fair statement?

(16)    A.    Yes.

(17)    Q.    Do you know of any reason why Officer

(18)    Obenski would not have attempted to serve this

(19)    fugitive warrant?

(20)    A.    Yes.

(21)    Q.    And why is that?

(22)    A.    Because I believe he was in the

(23)    hospital.

(24)    Q.    Do you remember your efforts to serve

## Page 28

(1)    this fugitive warrant?

(2)    A.    Yes, without referring to my report

(3)    for specific dates and times.

(4)    Q.    To the best of your recollection how

(5)    did you go about to serve this warrant?

(6)    A.    Once I obtained the fugitive warrant

(7)    from District Court I believe I contacted Martha

(8)    Gay at the district attorney's office.  She

(9)    authorized I believe a Zone 1 extradition, which is

(10)    any state that would touch Pennsylvania they would

(11)    extradite a person for that.  And at that point in

(12)    time I verified where the zones existed and I

(13)    contacted the agencies where I believe Mr. Mitchell

(14)    would be working and also where he resided.

(15)    Q.    Do you recall speaking with anyone at

(16)    his place of business?

(17)    A.    I believe I did speak to someone

(18)    there, I don't know the name.

(19)    Q.    Do you remember the actual business

(20)    that he was working at?

(21)    A.    U.S. Air I believe.

(22)    Q.    Do you recall the conversation that

(23)    you had with the person?

(24)    A.    No, I don't.  Only specifics what

# EXHIBIT "I"

~~HAS PAGED ME WITH NUMBERS FOR PEOPLE I~~ KNOW AND PEOPLE I ~~DON'T KNOW. I~~
~~SUSPECT HE HAS PAGED ME WITH THE #'S~~ THAT SPELL WHORE ON ~~THE CALL HAD. JUST~~
~~AS HE DID BEFORE I CHANGED MY PAGER #~~

TIMELINE............RHONDA MORRIS VS. GREGG MITCHELL

MARCH 1999 - MET GREGG AT THE END OF OUR TRAINING CLASS. AFTER TRAINING WE
DATED FOR A FEW WEEKS AND HE TRANSFERED TO D.C.

JANUARY 2000 - GREGG ESTABLISHED CONTACT AGAIN VIA PAGER. I RETURNED HIS
CALL. WE AGREED TO MEET WHILE HE WAS ON HIS OVERNIGHT AT THE HILTON IN
PHILADELPHIA.

FEBRUARY 2000 - WE MAINTAINED CONTACT, AS FRIENDS, MOSTLY SMALL TALK AND
CATCHING UP ON WHAT HAD BEEN GOING ON WITH THE OTHER. HE DID APPROACH ME
WITH THE IDEA OF TRYING TO HAVE A RELATIONSHIP AND I STATED I WAS NOT
INTERESTED BUT WOULD REMAIN FRIENDS. HE SAID HE WANTED TO STAY FRIENDS.

MARCH 2000 - HE ASKED ME TO E-MAIL A COUPLE OF PHOTOS TO HIM FOR SOMETHING
HE WAS WORKING ON FOR ME. I ACCOMIDATED HIM. I HAD MODELED PREVIOUSLY AND
HAD SOME PHOTOS ON MY COMPUTER. NONE OF WHICH WERE NUDE. HE CAME TO
TOWN TO SHOW ME WHAT HE HAD PUT TOGETHER. HE HAD PRODUCED A SLIDE SHOW
FOR ME TO USE TO GET BACK INTO MODELING. (HE NEVER GAVE ME THE PRODUCTION)

LATE MARCH 2000 - HE SUGGESTED WE DO A SHOOT TOGETHER. HE TOLD ME HE HAD
BEEN A PHOTOGRAPHER IN THE PAST AND WOULD LIKE TO WORK WITH ME AND
POTENTIALLY BE MY PERSONAL PHOTOGRAPHER. I THOUGHT ABOUT AND TALKED
ABOUT IT WITH SOME ASSOCIATES AND AGREED TO DO IT IF I HELD ALL COPYRIGHT
AUTHORITY, KEPT ALL THE NEGATIVES AND HAD FIRST RIGHT OF REFUSAL ON ALL THE
IMAGES.

APRIL 2000 - WE DECIDED TO GO TO HAWAII FOR THE SHOOT. WHILE WE WERE THERE HE
ASKED ME AGAIN TO BE HIS LADY AND I REFUSED AND TOLD HIM WE NEEDED TO STICK
TO BUSINESS OR WE COULD FORGET THE WHOLE DEAL. SOME OF THE NEGATIVES WERE
MISSING WHEN WE WERE PACKING TO COME HOME. I TOLD HIM I WOULD NOT SPEAK TO
HIM AGAIN OR HAVE ANY ASSOCIATION IF THEY WERE NOT RETURNED. HE FOUND
THEM AND RETURNED THEM. BUT DENIED HE PURPOSELY TOOK THEM. AFTERWHICH,
HE WAS VERY APOLOGETIC AND MADE MANY NICE GESTURES TO WIN MY TRUST BACK.
GESTURES IN THE FORM OF GIFTS AND FINANCIAL HELP TO GET MY MODELING CAREER
GOING AGAIN.

LATE APRIL 2000 - WE MAINTAINED OUR FRIENDSHIP AND I ENTRUSTED HIM WITH
ADVISING ME ON TECHNICAL PROCEEDURES HE SAID HE WAS A COMPUTER
PROGRAMMER/SPECIALIST AND COULD HELP ME GET ORGINIZED. HE SUGGESTED THAT
HE CATALOG ALL OF MY PHOTOS AND ORGINIZE THEM SO THEY WERE MORE EASILY
ACCESSED AND IN CASE THEY WERE DAMAGED I WOULD NOT LOSE THEM. I AGREED
AND ENTRUSTED MY PHOTOS TO HIM FOR THIS PURPOSE. AFTER HE HAD MY
PHOTOGRAPHS HE WAS MORE PUSHY ABOUT US BEING IN A RELATIONSHIP. I
CONTINUED TO TELL HIM I HAD NO INTEREST. HE TOLD ME ME SHORTLY AFTER HE HAD
THE PHOTOS THAT THERE WERE A COUPLE OF NUDE PHOTOS IN MY PILE OF 3000 PHOTOS.
I TOLD HIM I WAS SURPRISED BY THIS BECAUSE THE NUDE PHOTOS (TAKEN FOR A TEST
SHOOT FOR A WORKSHOP SPONSORED BY KODAK - WHICH I DECLINED TO DO AFTER
FURTHER THOUGHT) WERE LOCKED IN A SAFE DEPOSIT BOX IN CHICAGO, IL. I HAVE
ONLY 4 OR 5 ON MY COMPUTER AT HOME. I TOLD HIM NOT TO DO ANYTHING WITH
THEM AND HE GOT UPSET AND YELLED AT ME FOR NOT TRUSTING HIM, ETC....

EARLY MAY 2000 - HE MADE A VISIT TO EXTON, PA (ABOUT 10 MINS FROM WHERE I LIVE)

HE STAYED AT THE FAIRFIELD INN AT THE INTERSECTION OF ROUTE 100 AND 113. WE
WERE GOING TO MEET AND TALK ABOUT PROJECTS AND I BOUGHT WEBSITE SOFTWARE
SO HE COULD BUILD MY WEBSITE. I WAS ON-LINE THAT AFTERNOON AND HE IM'D ME
CLAIMING TO HAVE AN APPENDIX ATTACK. I TOLD HIM TO CALL THE AMBULANCE BUT
HE PLEADED WITH ME TO COME RIGHT OVER AND CALLED ME NUMEROUS TIMES UNTIL I
AGREED. WHEN I GOT THERE HE TRIED TO FORCE ME TO HAVE SEX WITH HIM AND
BECAME VERY UPSET WHEN I REFUSED. AT THAT POINT HE TOLD HE WAS READING MY
E-MAIL AND THAT I WAS NOTHING BUT A WHORE. I TRIED TO LEAVE THE ROOM AND HE
FORCED ME TO STAY THERE AND READ E-MAIL THAT I HAD NEVER GOTTEN AT HOME
BECAUSE HE HAD INTERCEPTED IT BEFORE I HAD A CHANCE TO READ IT. I FINALLY
TOLD HIM I WOULD NOT CALL THE POLICE IF HE LET ME LEAVE AND HE AGAIN
APOLOGIZED AND I LEFT. I TOOK HIM TO THE AIRPORT THE NEXT DAY AND TOLD HIM I
WANTED MY PHOTOS BACK AND THAT I WOULD PHONE HIS LOCAL POLICE IF HE DID NOT
COOPERATE.

 FOR A COUPLE OF DAYS HE PAGED ME AND CALLED ME CONSTANTLY 5, 10 AND
SOMETIMES 20 TIMES IN A DAY. HE WOULD SAY YOU KNOW YOU LOVE ME  AND IF YOUR
WITH ME I WON'T DO ANYTHING WITH YOUR PHOTOS AND I WON'T ASK FOR THE MONEY
BACK THAT I GAVE YOU.
I TOLD HIM TO JUST GIVE MY PHOTOS BACK AND LET'S JUST END IT. THAT NIGHT HE
HAD LINKED MY WEBPAGE TO AN AMATUER WHORES AND SLUTS WEBSITE. A FRIEND
CALLED TO TELL ME WHAT HE HAD DONE. I CALLED HIM AND HE REMOVED THE LINK. I
TOLD HIM I WANTED MY PHOTOS BACK IMMEDIATELY. WE MADE PLANS FOR ME TO
PICK THEM UP WITHIN A COUPLE OF DAYS. THE FIRST TIME I WAS GOING TO FLY OUT
THERE I WAS SO AFRAID THAT I DID NOT GET ON MY FLIGHT. I WENT OUT 2 DAYS
LATER. WHEN I GOT THERE HE ACTED LIKE WE WERE BEST FRIENDS AND THAT
NOTHING HAD HAPPENED. I FINALLY GOT TO MY PICTURES AND JUST WANTED TO
THROW THEM IN MY BAG AND GO. I ASKED TO CHECK HIS COMPUTER AND HE COMPLIED.
HE ERASED ALL IMAGES THAT I COULD FIND FROM HIS LAPTOP BUT HE TOLD ME HIS PC
WAS TORE DOWN AND HE WAS GOING TO GET RID OF IT SO I COULDN'T CHECK IT.  HE
HARASSED ME ABOUT GIVING HIM A PICTURE AND WHEN I REFUSED HE GOT
BELIGERENT WITH ME AND I WAS AFRAID OF HIM. HE MADE ME MISS MY FLIGHT OUT
THAT NIGHT AND I WAS VERY AFRAID AT THIS POINT. I STAYED THERE AND TOLD HIM I
WANTED TO GET ON THE EARLIEST FLIGHT HOME HE RESPONDED BY SAYING HE WOULD
GET ME BUT HE WOULDN'T TAKE ME THAT EARLY. HIS SISTER WAS IN THE HOUSE AND I
CONTACTED A FRIEND TO TELL HIM WHERE I WAS. I CHOSE TO GET THE PHOTOS MY
SELF BECAUSE IN A PREVIOUS CONVERSATION HE SAID IF THE POLICE ARE INVOLVED HE
WOULD CONTINUE TO "FUCK" WITH ME AND THAT HE WAS NO JOKE. DURING THE
COURSE OF THE EVENING HE HAD MADE THE COMMENT THAT HE WAS CAPABLE OF
KILLING ME AND I ASKED IF HE WOULD DO THAT TO ME AND HE SAID ABSOLUTELY.
WHEN HE DROVE ME TO THE AIRPORT THE NEXT DAY WE DIDN'T SPEAK, EXCEPT GOOD-
BYE. THAT NIGHT HE STARTED CALLING ME AND I STARTED INGNORING HIM. HE
STARTED PAGING ME AND CALLING ME ALL-DAY (FROM 240-602-7101) HE MADE MANY
THREATS ABOUT DEFAMING ME ON-LINE VIA INTERNET LINKS, POSTING PHOTOS, ETC.....
WE ARGUED A GREAT DEAL FOR A FEW DAYS. THEN I RECIEVED AN E-MAIL STATING
THAT HE HAD NO INENTION OF HURTING ME AND HE DIDN'T REALLY WANT ANY MONEY
BACK. HIS E-MAIL DID HOWEVER, SAY I SHOULD TAKE CARE OF LITTLEPOZER (WHICH IS
MY DAUGHTERS SCREEN NAME) LATER THAT SAME NIGHT HE CALLED ME AND SAID HE
WOULD SEE ME IN LA (WHICH WAS WHERE MY TRIP WAS GOING AND I HAD NOT TOLD
HIM) HE SAID I WAS A WHORE AND HE CHANGED HIS MIND.  HE HELD ALL THE CARDS
NOW AND HE WASN'T THREW WITH ME YET. HE LATER SENT ME E-MAILS FROM OTHER
SCREEN NAMES HE HAD BEEN USING TO GET INFORMATION FROM ME AND SENT ME AN
E-MAIL FROM MY DAUGHTERS SCREEN NAME.
HE ALSO SENT AN E-MAIL WITH MY ADDRESS BOOK NAMES IN IT TO SHOW ME HE WAS
GETTING INTO MY AOL SYSTEM. HE WOULD CALL AND TELL ME THINGS HE HAD READ
IN MY E-MAIL EVEN AFTER I CHANGED MY PASSWORD. MY PASSWORD IN COMPUSERVE



TO LOG ONTO CATCREW HAS BEEN REVOKED SEVERAL TIMES AND THE CATCREW HELP DESK SAID SOMEONE TRIED TO LOG ON WITH AN INCORRECT PASSWORD AND REVOKED MINE. IT IS REVOKED AT THIS POINT AND I DECIDED NOT TO RESET IT FOR PURPOSES OF INVESTIGATION. I SUSPECT HE HAS GOTTEN MY NEW PAGER NUMBER SOMEHOW AND AT CERTAIN TIMES DURING MY CONVERSATIONS WITH GREGG HE SAID IT WAS VERY EASY TO GET INTO HE SYSTEM AT WORK AND THAT HE COULD AND WOULD MAKE MY LIFE MISERABLE AT HOME AND AT WORK. HE SAID I WOULD REGRET EVER MEETING HIM AND I SAID I ALREADY DO.

# EXHIBIT "J"

## PAGE 1    SHEET 1

```
                                                    1

 1

 2           IN THE MAGISTERIAL DISTRICT COURT
                     NO. 15-2-07
 3           COUNTY OF CHESTER, PENNSYLVANIA

 4

 5
     COMMONWEALTH OF PENNSYLVANIA,   :
 6
          vs.                        :   CR-0000141-00
 7
     GREGORY MITCHELL                :
 8

 9

10

11                   Marsh Creek Corporate Center
                     35 E. Uwchlan Avenue, Suite 322
12                   Lionsville, Pennsylvania 19353
                     October 3, 2000
13                   11:15 a.m.

14

15   BEFORE:  HON. STANLEY SCOTT

16

17

18

19

20

21

22

23              KARASCH & ASSOCIATES
           REGISTERED PROFESSIONAL REPORTERS
24              PENNSYLVANIA and DELAWARE
                   (800) 621-5689
25
```

## PAGE 2

```
                                                    2

 1

 2

 3   APPEARANCES:

 4           CHESTER COUNTY DISTRICT ATTORNEY
             BY:  ELIZABETH PITTS, ESQUIRE
 5           Assistant District Attorney
             On behalf of the Commonwealth
 6
             MILTON S. SAVAGE, JR., ESQUIRE
 7           1616 Walnut Street, Ste. 1910
             Philadelphia, Pennsylvania 19103
 8           On behalf of the Defendant

 9

10   Also present:  Charles J. Crawford

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25              K A R A S C H  &  A S S O C I A T E S
```

## PAGE 3

```
                                                    3

 1

 2      INDEX                    PAGES

 3   WITNESS     DIRECT   CROSS   REDIR.   RECR.
     RHONDA MORRIS
 4
     BY MS. PITTS   14              48
 5
     BY MR. SAVAGE          36              49
 6

 7   WITNESS     DIRECT   CROSS   REDIR.   RECR.
     CHARLES CRAWFORD
 8
     BY MS. PITTS   50
 9
     BY MR. SAVAGE          51
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

        K A R A S C H  &  A S S O C I A T E S
```

## PAGE 4

```
                                                    4

 1

 2           THE COURT:  Is the Commonwealth

 3   ready?

 4           MS. PITTS:  Yes, Your Honor.  I

 5   would like to amend the complaint,

 6   however, to include some additional

 7   charges.  The Commonwealth would like to

 8   amend the complaint to include two counts

 9   of unlawful use of the computer which is

10   title 18, section 39-33.

11           I would also like to amend the

12   complaint to include 27 counts of

13   harassment by communication.  The dates

14   would be between the dates of April --

15   excuse me.  May 9, 2000 and May 26, 2000.

16   Those will include both electronic

17   communications as well as phone

18   communications.

19           THE COURT:  Give me the sections

20   again, please.

21           MS. PITTS:  I am sorry.  Which

22   sections?  Unlawful use of the computer?

23   That's title 18, section 39-33 of the

24   crimes code.

25           THE COURT:  Thank you.

        K A R A S C H  &  A S S O C I A T E S
```

5

```
 1
 2            MR. SAVAGE:  I would like to know
 3      when that section was enacted by the
 4      legislator?
 5            MS. PITTS:  I am sure I can find
 6      it in the crimes code.
 7            THE COURT:  I can't give you the
 8      date of enactment.
 9            MS. PITTS:  Unlawful use of the
10      computer, it looks like it was added
11      1987, effective 2/9/87, unlawful use of
12      the computer.  And actually I will
13      specifically cite under that section the
14      subsections of two and three and also
15      subsection one, Your Honor.
16            THE COURT:  One, two and three?
17            MS. PITTS:  Yes, please.  And just
18      so Your Honor is aware, we are also going
19      under on these other harassment by
20      communications charges for incidents
21      which occurred at the victim's home in
22      East Brandywine Township that we are --
23      we believe it is proper to bring those at
24      this time based on the new rule of
25      criminal procedure which allows for all
```

6

```
 1
 2      charges to be located in the same
 3      judicial district and therefore we are
 4      proceeding under -- and I am sorry.  I
 5      think it's number 371.  I'll have to
 6      check.  I don't have my latest edition of
 7      the Pennsylvania Rules of Criminal
 8      Procedure, but it is fairly new.  That's
 9      what we will be proceeding under.
10            MR. SAVAGE:  Your Honor,
11      respectfully, I object to the amendment
12      of the charges in that I don't have
13      notice.  They're very specific.  And
14      furthermore, the time period for which
15      these new allegations are submitted are
16      such of a sweeping nature and of a
17      distance between them, that it's hard to
18      prepare a questioning for today of the
19      witness.
20            MS. PITTS:  Your Honor, if I may
21      respond --
22            MR. SAVAGE:  More importantly,
23      they were not subject of the affidavit
24      for which Mr. Mitchell appears today.
25            MS. PITTS:  Your Honor, if I may
```

7

```
 1
 2      respond.
 3            THE COURT:  Go ahead.
 4            MS. PITTS:  The defendant is
 5      charged with harassment as well as the
 6      other sexual assault charges.  However,
 7      under this new rule, under the
 8      Pennsylvania Rules of Criminal Procedure,
 9      it specifically states that is there is a
10      continuing course of conduct or where a
11      defendant is already charged with similar
12      crimes, this would not be in any way
13      prejudicial at this point in time.
14            Certainly counsel has the
15      opportunity to cross-examine the witness
16      here today.  This is a preliminary
17      hearing.  And we believe that under this
18      particular section of the Rules of
19      Criminal Procedure and because the
20      defendant is already charged with the
21      stalking charge and the harassment
22      charge, these all are the same or similar
23      crimes and all go to the same type of
24      event.  The time frame is very short.  We
25      are talking about time frame of April
```

8

```
 1
 2      10th to May 26th.  So certainly the
 3      defendant would have been on notice that
 4      he was subject to these offenses based on
 5      the nature of the current affidavit.
 6            THE COURT:  Would you like to show
 7      me where in that affidavit that he would
 8      be put on notice on these charges that
 9      you are amending?
10            MS. PITTS:  Your Honor, the charge
11      of harassment in that the defendant --
12      actually I stand corrected.  This
13      harassment charge goes to the physical
14      nature of the acts --
15            THE COURT:  It went on the
16      existing affidavit?
17            MS. PITTS:  Yes, that's correct.
18      But certainly we believe that the other
19      charges of by harassment by communication
20      stemming from the same incident would not
21      in any way prejudice the defendant here
22      today.
23            MR. SAVAGE:  Your Honor, counsel
24      is referring to an incident.  Then she
25      says the dates of the charges stem from
```

PAGE 9  SHEET 3

9

```
 1
 2     April 10 to May 26.  It seems to be more
 3     than an incident.  I mean, what she's
 4     trying to do now is amend the complaint
 5     to include several incidents.  I'm just
 6     not prepared to --
 7          THE COURT:  Defend it?  You're not
 8     prepared to defend that today?
 9          MR. SAVAGE:  Exactly.  Exactly.
10          THE COURT:  I would like to take
11     care of this matter today inasmuch as we
12     have all of the parties here today,
13     Mr. Savage.
14          MR. SAVAGE:  I have a question.
15          THE COURT:  Of course, if it's not
16     covered and testified through testimony,
17     it will be stricken by the Court or
18     dismissed.  But I think for the purposes
19     of this hearing -- and yes, it does put
20     you at somewhat of a disadvantage.  I
21     don't know exactly what they're going to
22     present.  But I am in agreement with you
23     to the degree where you have no advanced
24     notice, and I don't know why you would be
25     expected to have that notice or expect
```
K A R A S C H  &  A S S O C I A T E S

PAGE 10

10

```
 1
 2     those charges to be brought today.
 3          Why don't we have our hearing, and
 4     then the Court will make a decision
 5     concerning whether or not there will be
 6     -- if prima facia evidence is presented
 7     here today to uphold it or not, but I
 8     can't do that unless I hear what they
 9     have to offer.
10          MS. PITTS:  Your Honor, I would be
11     happy to inform Mr. Savage outside the --
12     step outside the courtroom, I can tell
13     him exactly what it is that we're going
14     to be proceeding on.  If you give me two
15     or three minutes, that's all it will
16     take.
17          MR. SAVAGE:  I just ask to get on
18     with it.
19          THE COURT:  Just go on.  We'll
20     proceed with the amended charges.
21     Whether or not they will be carried over
22     will depend on what's presented at the
23     hearing today.
24          MS. PITTS:  Thank you, Your Honor.
25          THE COURT:  Is the Commonwealth
```
K A R A S C H  &  A S S O C I A T E S

PAGE 11

11

```
 1
 2     prepared to proceed?
 3          MS. PITTS:  Yes, Your Honor.  The
 4     Commonwealth calls Rhonda Morris.
 5          THE COURT:  Just for the record,
 6     the matter before the Court today
 7     involves a criminal complaint charging
 8     the defendant, Greg Mitchell, with an
 9     address of 5 Riviera Court, Silver
10     Springs, Maryland, with the following
11     charges, those being indecent assault.
12     Sorry.  Indecent assault, harassment,
13     harassment -- I don't know why these are
14     designated the way they are.  But two
15     charges of summary harassment, stalking,
16     stalking, summary stalking, misdemeanor,
17     and the additional charges today,
18     including two counts of unlawful use by
19     computer, 27 counts.  Is that harassment
20     by communication?
21          MS. PITTS:  Yes, Your Honor.
22     Communication.
23          THE COURT:  Defendant is
24     represented by Milton Savage, Esquire.
25     Do you wish to waive any future reading
```
K A R A S C H  &  A S S O C I A T E S

PAGE 12

12

```
 1
 2     of the complaint, Mr. Savage?
 3          MS. PITTS:  Yes, Your Honor.
 4          THE COURT:  And enter a plea of
 5     not guilty?
 6          MR. SAVAGE:  Yes, Your Honor.
 7          THE COURT:  Very well.  Is the
 8     Commonwealth prepared to proceed?
 9          MS. PITTS:  Yes.  Thank you, Your
10     Honor.
11          THE COURT:  We have a
12     sequestration request; is that correct?
13          MS. PITTS:  Yes, we do, Your
14     Honor.
15          MR. SAVAGE:  Your Honor, the
16     witnesses here are not here to testify.
17          THE COURT:  Are they potential
18     witnesses as at any time for this matter?
19     That's what -- whether they're witnesses
20     for today or not -- they may be
21     considered witnesses whether by character
22     or otherwise future-wise.
23          MR. SAVAGE:  Yes, they would be.
24          THE COURT:  Then I ask them to
25     step out.  Sorry, folks.  Is there a like
```
K A R A S C H  &  A S S O C I A T E S

13

1
2    request by you with the lady in the back?
3        MR. SAVAGE: Yes.
4        MS. PITTS: She's with the Crime
5    Victim's Center.
6        THE COURT: Okay. Okay.
7        MS. PITTS: Thank you.
8        THE COURT: Are you prepared to
9    proceed?
10       MS. PITTS: Yes.
11       THE COURT: The first witness is?
12       MS. PITTS: Rhonda Morris.
13       MR. SAVAGE: Your Honor, I would
14   like to know the identify of the person
15   sitting at the table, whether or not that
16   person would be subject to the order as
17   well?
18       MS. PITTS: Your Honor, he's the
19   affiant, Sergeant Crawford.
20       MS. PITTS: Well, he will be
21   testifying, he might be testifying
22   today --
23       THE COURT: The affiant is
24   permitted to remain in the courtroom.
25   The Commonwealth's first witness is
     K A R A S C H  &  A S S O C I A T E S

14

1                    RHONDA MORRIS
2    Rhonda Morris; is that correct?
3        MS. PITTS: Yes, Your Honor.
4        THE COURT: You may proceed.
5        MS. PITTS: Your Honor, do you
6    wish to swear in the witness?
7        THE COURT: Do you want to stand
8    up, please.
9                    -  -  -
10   RHONDA MORRIS, having been duly sworn,
11   was examined and testified as follows:
12       -- DIRECT EXAMINATION --
13   BY MS. PITTS:
14       Q.    Would you state your name and spell
15   your last name for the record, please.
16       A.    Rhonda Morris, M-O-R-R-I-S.
17       Q.    And Ms. Morris, back on April 10th
18   of the year 2000 did you know an individual by
19   the name of Gregory Mitchell?
20       A.    Yes, I did.
21       Q.    And do you see him in the courtroom
22   today?
23       A.    Yes, I do.
24       Q.    Would you just describe what he's
25   wearing?
     K A R A S C H  &  A S S O C I A T E S

15

1                    RHONDA MORRIS
2        A.    A blue suit, white shirt and a tie.
3        Q.    And back on April 10th of the year
4    2000, did you see Mr. Mitchell at any point
5    during that day?
6        A.    I'm sorry?
7        Q.    On April 10 of 2000 --
8        A.    Yes.
9        Q.    I'll ask you to let me finish my
10   question before you answer because we have a
11   court reporter and he can't take down our
12   answers at the same time. On April 10th of 2000
13   did you have the occasion to see Mr. Mitchell?
14       A.    Yes.
15       Q.    And at approximately what time did
16   you see him that afternoon?
17       A.    Approximately 2:30.
18       Q.    And where is it that you saw him?
19       A.    At the Fairfield Inn Hotel.
20       Q.    The Fairfield Inn Hotel? And at
21   that point in time were you dropping him off or
22   picking him up or how is it that you saw him at
23   the hotel?
24       A.    He had told me he was having an
25   appendix attack. He contacted me at home and
     K A R A S C H  &  A S S O C I A T E S

16

1                    RHONDA MORRIS
2    told me he was having an appendix attack.
3        Q.    Let me back up for just a minute.
4    When he called you at home, was that the first
5    time you had had contact with him that day?
6        A.    No. No. I had dropped him off the
7    hotel earlier.
8        Q.    Do you recall approximately what
9    time you dropped him off at the hotel?
10       A.    Around 2:00.
11       Q.    In the afternoon?
12       A.    Yes.
13       Q.    And then where did you go after you
14   dropped him off?
15       A.    Home.
16       Q.    And approximately how long after you
17   had been home did you receive a phone call from
18   the defendant?
19       A.    It was an instant message, and
20   almost immediately. I told him I was going home
21   to check my e-mail and settle in and then I
22   would be back.
23       Q.    You told him you would be back
24   later?
25       A.    Yes.
     K A R A S C H  &  A S S O C I A T E S

17

RHONDA MORRIS

1
2      Q.    At the time that you went home and
3  you checked your instant message, what did it
4  say?
5      A.    That he was having an appendix
6  attack.
7      Q.    And did you have any other contact
8  with him either on the computer or the phone at
9  that point?
10     A.    I had responded to his instant
11 message and asked him to call an ambulance or
12 notify someone else and he insisted that I come
13 and was I going to let him die.
14     Q.    And did you go to the hotel?
15     A.    Yes, I did.
16     Q.    And did you go to his room?
17     A.    Yes.
18     Q.    And what happened when you went to
19 his room?
20     A.    When I came to the room he had his
21 hand on his side as if he was in pain.  And then
22 I asked him if I should take him to the
23 hospital.  And he said no, he would -- he didn't
24 think it was an appendix attack any more.
25     Q.    And after he said that, what did he

K A R A S C H  &  A S S O C I A T E S

18

RHONDA MORRIS

1
2  do, if anything?
3      A.    Then he forced me onto the bed and
4  started touching me and saying, come on, baby,
5  you know you want it, I love you, and things of
6  that nature.
7      Q.    Okay.  Now, when you were on the bed
8  what part of his body did -- what part of your
9  body did he touch?
10     A.    My breast and my pubic area.
11     Q.    And did he in any way touch any of
12 your clothing?
13     A.    Yes.  He undid my pants, my belt
14 buckle and my zipper.
15     Q.    And when he undid your pants and
16 your belt buckle and your zipper, what did he
17 do?
18           MR. SAVAGE:  Objection.
19     Objection.
20           THE COURT:  Wait a minute, ma'am.
21           MR. SAVAGE:  Objection.  Leading
22     question, what did he do.  She can ask
23     what, if anything, else occurred.
24           THE COURT:  Okay.  Sustained.
25 BY MS. PITTS:

K A R A S C H  &  A S S O C I A T E S

19

RHONDA MORRIS

1
2      Q.    I'll rephrase.  After your pants
3  were unbuttoned and your belt was unbuttoned,
4  what happened next?
5      A.    He put his hands inside my pants and
6  I pushed his hand away and he immediately
7  grabbed my breast.
8      Q.    And when he put his hands in your
9  pants, did he put it inside your underwear?
10     A.    Yes.
11     Q.    What were you saying during this
12 time?
13     A.    Leave me alone, no, what are you
14 doing.  I was very confused because he had
15 called me there telling me he had a appendix
16 attack, and then he was all over me.  I just
17 kept telling him to leave me alone.
18     Q.    When you were put on the bed, could
19 you describe how you were put on the bed?
20     A.    He had both his hands on my
21 shoulders and just sort of fell on me.  He
22 pushed me and fell on me onto the bed.
23     Q.    And did you feel like you were able
24 to get up?
25     A.    No.  No.  He was on top of me.

K A R A S C H  &  A S S O C I A T E S

20

RHONDA MORRIS

1
2      Q.    At some point did this stop?
3      A.    Yeah.
4      Q.    What happened after it stopped?
5      A.    He told me even though I had -- I
6  apologize for my language, but even though I had
7  fucked up, he still wanted to work things out
8  and that he loved me and we could do this and he
9  wanted to be with me.
10           MR. SAVAGE:  I'm sorry, Your
11     Honor.  I didn't hear the last word.
12           THE COURT:  Do you want to keep
13     your voice up a little bit?
14           THE WITNESS:  Okay.
15 BY MS. PITTS:
16     Q.    At that point, were you able to
17 leave the room?
18     A.    No.
19     Q.    Why not?
20     A.    He had told me -- actually, I am
21 sorry.  He told me that I was going to listen to
22 what he had to say.  He had his laptop opened on
23 the bedstand next to the bed.
24     Q.    Did you attempt to leave the room?
25     A.    Yes, I did.

K A R A S C H  &  A S S O C I A T E S

PAGE 21  SHEET 6

21

RHONDA MORRIS

2    Q.    What happened when you attempted to
3  leave the room?
4    A.    He grabbed my wrist and he said that
5  I was going to listen to what he had to say.
6    Q.    What did he do when he grabbed your
7  wrist?
8    A.    He prevented me from leaving the
9  room.
10   Q.    What if anything did he do in terms
11 of having you listen?
12   A.    He sat me down in the chair next to
13 the laptop.
14   Q.    How did he sit you down?
15   A.    With both hands on my biceps, my
16 bicep area.
17   Q.    Did he push you into the chair or
18 did --
19   A.    He forced me down.  He didn't push
20 me, but he forced me to sit down.
21   Q.    And once you were in the chair, what
22 occurred?
23   A.    He signed onto my AOL account.
24   Q.    When you say he signed onto your AOL
25 account, is that an e-mail account?

K A R A S C H  &  A S S O C I A T E S

---

PAGE 22

22

RHONDA MORRIS

2    A.    Yes.
3    Q.    Is that on the computer?
4    A.    Yes.
5    Q.    Did he have by your permission
6  access to your e-mail account?
7    A.    No.  He stole my password.
8    Q.    And how do you know he stole your
9  password?
10   A.    Because he signed onto my account
11 and opened my e-mail in front of me.
12   Q.    And had you ever given him
13 permission to do that?
14   A.    No.
15   Q.    Once he opened your e-mail, what did
16 he do?  Did he say anything to you at that
17 point?
18         MR. SAVAGE:  Objection.
19 Objection.
20         THE COURT:  Wait a minute, ma'am.
21 When defense counsel objects, try not to
22 say anything.
23         THE WITNESS:  Sorry.
24         MR. SAVAGE:  Two questions, Your
25 Honor, first, what did he do.  Then

K A R A S C H  &  A S S O C I A T E S

---

PAGE 23

23

RHONDA MORRIS

2  there's no response.  And then counsel
3  asked her did he say anything to her.
4  That's a leading question.  She hadn't
5  answered the first question.
6         THE COURT:  Okay.  Let's not get
7  too picky here with the objections, okay?
8  So we can forgo the objection and let
9  them proceed.  I won't overrule your
10 objection, sir.  Do you want to restate
11 your question, ma'am?
12         MS. PITTS:  Yes.  Thank you, Your
13 Honor.
14 BY MS. PITTS:
15   Q.    What, if anything, did the defendant
16 say to you after he had opened your e-mail?
17   A.    He told me that I was a whore and
18 how was Howard, things that he wouldn't have
19 known without reading my e-mail.  I didn't even
20 know because I had never read the e-mail.  He
21 intercepted my e-mail before I read it.  And he
22 was just saying how could I play him and that I
23 was a whore.
24   Q.    And how did you feel during this
25 time that you were in his hotel room?

K A R A S C H  &  A S S O C I A T E S

---

PAGE 24

24

RHONDA MORRIS

2    A.    I felt afraid.  I didn't know what
3  he was going to do next.  I certainly didn't
4  feel like I could leave.
5    Q.    When -- at some point did you return
6  to your home?
7    A.    Yes, I did.
8    Q.    And approximately how long after you
9  returned to your home did you hear from the
10 defendant?
11   A.    Almost immediately.
12   Q.    At what point did the defendant
13 say and how did he communicate with you at that
14 point?
15   A.    He said that he was sorry for what
16 had happened and that he wanted things to work
17 out and that he loved me and basically that he
18 was sorry and he was willing to do this even
19 though I screwed up.
20   Q.    How did he communicate that to you?
21 Was it through the computer, phone?
22   A.    Phone, telephone.
23   Q.    At some point after that did you
24 hear from the defendant again?
25   A.    On a number of occasions.

K A R A S C H  &  A S S O C I A T E S

25

```
 1                RHONDA MORRIS
 2       Q.   When was the next time that you
 3   heard from the defendant, and in what form of
 4   communication, if you recall?
 5       A.   Well, I had heard from him after
 6   that. I told him whatever he wanted to hear to
 7   get out of the hotel room, and I also went to
 8   retrieve some property that belonged to me
 9   and --
10       Q.   In the hotel room?
11       A.   No. At his -- in D.C., where he
12   lived.
13       Q.   And that would have been after the
14   April 10th incident?
15       A.   Yes.
16       Q.   And at some point in time did you
17   hear from the defendant through the computer?
18       A.   Yes.
19       Q.   And in what form was that
20   communication? Was it e-mail?
21       A.   Yes.
22       Q.   And do you recall how many times
23   approximately that the defendant communicated
24   through the e-mail to you?
25       A.   At least 30 times. Through the
            K A R A S C H  &  A S S O C I A T E S
```

26

```
 1                RHONDA MORRIS
 2   e-mail?
 3       Q.   Yes.
 4       A.   Between 20 and 30 times.
 5       Q.   And do you recall the approximate
 6   time -- time frame within which this occurred?
 7       A.   Between May 9th and June -- the
 8   first day was May 9th.
 9       Q.   Do you recall whether or not that
10   May 9th e-mail was in any way alarming to you or
11   threatening --
12           MR. SAVAGE:  Your Honor, I have to
13       object.
14           THE COURT:  I agree. Sustained.
15   BY MS. PITTS:
16       Q.   The e-mail from May 9th, do you
17   recall the content of that e-mail?
18       A.   Yes. It was -- it was a letter
19   stating that he didn't want to continue our
20   friendship or relationship or whatever we had
21   and it had the addresses from my address book in
22   my e-mail account which indicated to me that he
23   was continuing to read my e-mails and access my
24   account.
25       Q.   The addresses that were in the
            K A R A S C H  &  A S S O C I A T E S
```

27

```
 1                RHONDA MORRIS
 2   e-mail that was sent to you, were those
 3   something that were within your computer?
 4       A.   They were within my e-mail account.
 5       Q.   And are you the only person who can
 6   access your e-mail account?
 7       A.   Yes.
 8       Q.   At that point in time were you aware
 9   as to whether or not the defendant had again
10   been in your e-mail?
11       A.   No. I didn't think that he was
12   still accessing my account. I had changed my
13   passwords since then.
14       Q.   You mean before the May 9th?
15       A.   Yes.
16       Q.   So once you saw that e-mail on May
17   9th, did you then think he was again in your
18   computer?
19       A.   Yes. There was no other way he
20   could have gotten that information.
21       Q.   You do have to keep your voice up.
22       A.   Sorry.
23       Q.   Do you recall any other e-mails
24   after May 9th that stands out in your mind?
25       A.   There was a series of e-mails.
            K A R A S C H  &  A S S O C I A T E S
```

28

```
 1                RHONDA MORRIS
 2   There was a fraudulent e-mail account set up
 3   with my name on it that I received a number of
 4   harassing e-mails from, some of which pictures
 5   were attached to that he had sent to people from
 6   my address book.
 7       Q.   Now, these pictures that were
 8   attached to the e-mail, were they pictures of
 9   you?
10       A.   Yes.
11       Q.   And were they nude pictures of you?
12       A.   Yes.
13       Q.   And these pictures of you, were they
14   something that the defendant had access to
15   during the time that you knew him?
16       A.   No.
17       Q.   Where were those nude pictures of
18   you?
19       A.   In Chicago.
20       Q.   Where in Chicago?
21       A.   In a safe deposit box.
22       Q.   Were they anywhere else?
23       A.   On the hard drive on my computer.
24       Q.   Is that the only place where they
25   were?
            K A R A S C H  &  A S S O C I A T E S
```

29

```
 1              RHONDA MORRIS
 2      A.    Yes.
 3      Q.    In order for those e-mails to be in
 4  that -- in order for those photos to be in your
 5  e-mail, would they have had to have come from
 6  your hard drive?
 7      A.    Yes.
 8            MR. SAVAGE:  Objection, Your
 9      Honor.  I mean, that's -- that calls for
10      speculation.  She's testified that they
11      are in two different locations.  Now
12      she's saying they have to come from her
13      hard drive.
14            MS. PITTS:  Your Honor, this
15      witness would know whether or not they
16      were in any other locations.  And if one
17      place is in a safe deposit box and one
18      place is in a hard drive, then I think
19      this witness can say they would have to
20      come from the hard drive.
21            THE COURT:  I agree.
22            MS. PITTS:  Thank you.
23            THE COURT:  Overruled.
24  BY MS. PITTS:
25      Q.    Now, those pictures of you were sent
          K A R A S C H  &  A S S O C I A T E S
```

30

```
 1              RHONDA MORRIS
 2  -- were they sent to only you?
 3      A.    Yes.
 4      Q.    And were the nude pictures sent to
 5  anyone else that you know?
 6      A.    No.  There were a couple of people
 7  in my address book that they were sent to, but I
 8  didn't send them.
 9      Q.    Okay.  So how did you know that they
10  were sent to people other than yourself?
11      A.    Because I received an e-mail from
12  the fraudulent account with the response from
13  the people that they were sent to.  Along with
14  it, the picture was attached.
15      Q.    This account that you are referring
16  to, was that an account that had your name on
17  it?
18      A.    Yes, I did.
19      Q.    And did you set up that account?
20      A.    No, I didn't.
21      Q.    Did you receive any communications
22  from the defendant regarding these pictures that
23  were sent, if you recall?
24      A.    I received comments from the
25  fraudulent account, NEX(ph), little snilely
          K A R A S C H  &  A S S O C I A T E S
```

31

```
 1              RHONDA MORRIS
 2  faces that would be sent to me from that
 3  account.
 4      Q.    So basically these accounts from you
 5  were being sent messages to you?
 6      A.    Uh-huh.
 7      Q.    And you were not the one doing it?
 8      A.    Right.
 9      Q.    Did you receive any phone calls from
10  the defendant during this time after the hotel
11  incident?
12      A.    Yes, I did.
13      Q.    And what types of phone calls did
14  you receive from him?
15      A.    Mostly threatening phone calls, that
16  he had my pictures and that he was going to send
17  them to people and I couldn't do anything about
18  it.
19      Q.    And when he said he was -- he had
20  your pictures, do you know what he was referring
21  to?
22      A.    From the e-mail, yes, I did.
23      Q.    Did he leave any messages for you at
24  all during this period of time?
25      A.    Yes, he did.
          K A R A S C H  &  A S S O C I A T E S
```

32

```
 1              RHONDA MORRIS
 2      Q.    And where were those messages left?
 3      A.    On my pager and my phone, my cell
 4  phone.
 5      Q.    And could you describe what happened
 6  in connection with your cell phone and calls
 7  from the defendant?
 8      A.    On one occasion I had missed 20
 9  phone calls, and when I pushed the button to
10  list who they were from, there was one name and
11  phone number from Greg.
12      Q.    A phone number from Greg?
13      A.    Greg Mitchell.
14      Q.    When you pushed the message button
15  on your cell phone, the defendant's phone number
16  came up?
17      A.    Yes, it did.
18      Q.    Did his name come up as well?
19      A.    Yes.
20      Q.    Did those happen all on the same
21  day?
22      A.    Yes.
23      Q.    Do you recall if that day was after
24  the incident which occurred at the hotel?
25      A.    Yes, it was.
          K A R A S C H  &  A S S O C I A T E S
```

33

RHONDA MORRIS

1
2      Q.    Do you recall when that incident
3  occurred?
4      A.    It would have been the same day I
5  reported it to the East Brandywine police, but I
6  don't recall the exact date.
7      Q.    So whatever that date is?
8      A.    Whatever that date is.
9      Q.    Are there any other e-mails that you
10  recall receiving from the defendant in
11  particular? And if you don't, perhaps looking
12  at some of the e-mails would refresh your
13  recollection?
14      A.    Yes, they would help.
15            MS. PITTS: May I approach the
16      witness, Your Honor?
17            THE COURT: You may.
18            MS. PITTS: I am showing you a
19      collection of e-mails. I would like you
20      to look at these and see if any of those
21      refresh your recollection as to the
22      e-mails sent to you by the defendant.
23            MR. SAVAGE: Your Honor, I am
24      going to object to the use of those
25      documents to refresh recollection.

K A R A S C H  &  A S S O C I A T E S

---

34

RHONDA MORRIS

1
2      There's no rendition at all of
3  authenticity to the documents. They're
4  just words on paper. In fact, they don't
5  appear to be original documents.
6            THE COURT: Overruled.
7            THE WITNESS: At one point in time
8      I had e-mailed Greg and asked him to stop
9      harassing me. And I told him that I
10      wouldn't call the police, I wouldn't
11      report anything if he just stopped. And
12      he responded with an e-mail from the
13      fraudulent account that said let's do it
14      the hard way.
15            On one occasion he sent me an
16      e-mail from my daughter's e-mail account
17      that said he -- $1,500 in six months,
18      that money that he wanted. He had sent
19      an invitation to a club photo page where
20      it was a picture of him in his army gear
21      with a gun. I had thought maybe that my
22      pictures were up there. And I think he
23      had written slanderous things also in the
24      club photo page that said that I was a
25      whore and that I liked to sleep with

K A R A S C H  &  A S S O C I A T E S

---

35

RHONDA MORRIS

1
2      pilots and things to that effect.
3            And then there was one from a
4      screen name that was from -- Jeff Stiller
5      was the screen name, but the message read
6      I am not a photographer, I am Greg, you
7      whore.
8  BY MS. PITTS:
9      Q.    These e-mails that you were sent and
10  these phone calls and messages, how did they
11  make you feel?
12      A.    Afraid.
13      Q.    At any time during the time that you
14  were in the hotel room with the defendant on the
15  10th of April, did you give him permission to
16  touch you in the way he touched you?
17      A.    No, not at all.
18            MS. PITTS: One moment, Your
19      Honor.
20            THE COURT: Very well.
21            MS. PITTS: I have no further
22      questions at this time, Your Honor.
23            THE COURT: Very well.
24      Cross-examine, counsel?
25            MR. SAVAGE: Yes.

K A R A S C H  &  A S S O C I A T E S

---

36

RHONDA MORRIS

1
2      -- CROSS-EXAMINATION --
3  BY MR. SAVAGE:
4      Q.    Ms. Morris, you testified that on
5  April the 10th you took Mr. Mitchell to the
6  hotel?
7      A.    Yes.
8      Q.    Fairfield Hotel. Okay. And that
9  you intended to return to the Fairfield Hotel to
10  see him; is that your testimony?
11      A.    Yes.
12      Q.    All right. And you intended to see
13  him for the purposes of visiting him alone;
14  isn't that correct?
15      A.    No.
16      Q.    Okay. You were going to visit him
17  with other people?
18      A.    I was going to visit him to work on
19  a web site. I had purchased web sites software
20  and he agreed to help me design it.
21      Q.    Okay. And you were going to do that
22  in the hotel room?
23      A.    Yes.
24      Q.    Okay. That was the only reason why
25  you went back to the -- that you intended to go

K A R A S C H  &  A S S O C I A T E S

37

RHONDA MORRIS

1
2  back to the Fairfield Hotel?
3      A.    Yes.  I would have had to take him
4  to the airport, but that would have been the
5  extent.
6      Q.    All right.  Can you describe the
7  room for me?  Was there a bed in the room?
8      A.    Yes.
9      Q.    Was there two beds or one single
10  bed?
11      A.    One bed.
12      Q.    Okay.  And when -- you said you
13  walked in the room.  Where did he grab you,
14  supposedly?  Where did he grab you when you
15  walked in the room?
16      A.    He didn't grab me when I walked in
17  the room.  He grabbed me later.
18      Q.    He grabbed you later?
19      A.    He had his hand on his side when I
20  walked in the room.
21      Q.    That was after you had an exchange
22  of words?  You had a conversation with him
23  before he grabbed you?
24      A.    Oh, yes.
25      Q.    Okay.  Were you talking about the
            K A R A S C H   &   A S S O C I A T E S

38

RHONDA MORRIS

1
2  web site?
3      A.    No.  We were talking about his
4  appendix attack.
5      Q.    Okay.  And he said that he no longer
6  felt that he had an appendix problem?
7      A.    Yes.
8      Q.    Had you been alone with him before?
9            MS. PITTS:  Objection.  Relevance.
10            THE COURT:  I'll let her answer
11      the question.  You may answer the
12      question, ma'am.
13            THE WITNESS:  Okay.  Yes, I had
14      been with him alone before.
15            MR. SAVAGE:  You had intimate
16      relationships with Mr. Mitchell before?
17            THE WITNESS:  Yes.
18            MS. PITTS:  Objection.  Relevance.
19            MR. SAVAGE:  Your Honor, this goes
20      to -- I am just dealing with the elements
21      of the offenses charged.
22            MS. PITTS:  Your Honor, whatever
23      preceded --
24            THE COURT:  Anything preceding I
25      -- the Court is not -- I am going to
            K A R A S C H   &   A S S O C I A T E S

39

RHONDA MORRIS

1
2      sustain the objection.
3            MR. SAVAGE:  Very well, Your
4      Honor.
5  BY MR. SAVAGE:
6      Q.    All right.  So you said there came a
7  point in time where he put his hands on you?
8      A.    Yes.
9      Q.    Right.  And can you show the Court
10  exactly where he put his hands on you?  Can you
11  stand up and show the Court?
12            MS. PITTS:  I am going to object,
13      Your Honor.
14            THE COURT:  I think -- I agree.  I
15      don't feel it's necessary.  I think the
16      explanation that the witness had given
17      during the testimony is sufficient, sir,
18      without a public display of that.
19  BY MR. SAVAGE:
20      Q.    Approximately how long were you in
21  the hotel room with Mr. Mitchell?
22      A.    Between 30 and 40 minutes.
23      Q.    30 and 40 minutes.  The hotel room
24  was opened; is that correct?
25      A.    Opened?
            K A R A S C H   &   A S S O C I A T E S

40

RHONDA MORRIS

1
2      Q.    Right.  Opened for business?
3      A.    Yes.
4      Q.    And there were people working in the
5  hotel room, in the hotel itself?
6      A.    I would think so, yes.
7      Q.    There was somebody at the front desk
8  that you passed on the way to the room?
9      A.    Yes.
10      Q.    Okay.  And the whole time you were
11  in the hotel room, did you -- did you attempt to
12  make a phone call outside of the hotel room?
13      A.    No.  I couldn't get to the phone.
14      Q.    Did he have both hands -- was he
15  restraining both of your arms in the room?
16      A.    At what point?
17      Q.    At any point.
18      A.    Yes.
19      Q.    Okay.  And what point was that, when
20  he was restraining both your arms?
21      A.    When he sat me down in the chair.
22      Q.    In the chair?
23      A.    Yes.
24      Q.    Okay.  How long were you in the
25  chair?
            K A R A S C H   &   A S S O C I A T E S

PAGE 41  SHEET 11

41

1                    RHONDA MORRIS
2      A.   Probably about 20 minutes
3  altogether.
4      Q.   So he was holding you for the whole
5  20 minutes?
6      A.   No, not the whole time.
7      Q.   Okay. How long was he holding you
8  in the chair?
9      A.   Long enough to sit me down. And
10  then when he was signing onto the computer, he
11  left one hand on my shoulder and accessed the
12  computer with the other.
13      Q.   Had you seen that computer before?
14      A.   Yes.
15      Q.   Had you used that computer before?
16      A.   No, I hadn't personally used the
17  computer. We watched movies on it in the past.
18      Q.   Now, you testified that immediately
19  after you got home you had an instant message on
20  your computer?
21      A.   The first time I went home?
22      Q.   The first time you went home, right.
23  This is before you went back to the hotel.
24      A.   Yes, I did.
25      Q.   And was there any particular reason
              K A R A S C H  &  A S S O C I A T E S

PAGE 42

42

1                    RHONDA MORRIS
2  why you checked your computer for instant
3  messages?
4              MS. PITTS: Objection. Relevance.
5              THE COURT: Sustained.
6  BY MR. SAVAGE:
7      Q.   Okay. After having left the hotel
8  room, you said you went straight home; is that
9  correct?
10      A.   Yes.
11      Q.   You said that Mr. Mitchell called
12  you as soon as you got home or there was a
13  message for you?
14      A.   I was checking my e-mail because I
15  had been -- I had not accessed it. So I was
16  checking my messages on my e-mail when I got
17  home.
18      Q.   Okay. So you checked your messages
19  before you went to the hotel room, and then you
20  checked it afterwards?
21      A.   I am sorry. I am a bit confused by
22  what you're asking me.
23      Q.   Earlier I had asked you whether you
24  checked your computer for e-mail messages before
25  you went back responding to Mr. Mitchell's claim
              K A R A S C H  &  A S S O C I A T E S

PAGE 43

43

1                    RHONDA MORRIS
2  that he had -- as you say, he had an appendix
3  attack, correct? And that question was -- I
4  couldn't ask that question. Now I am asking you
5  whether you checked your messages when you got
6  home the second time after you left
7  Mr. Mitchell.
8      A.   I didn't check my messages. I went
9  home to change my password.
10      Q.   Okay. So you -- in changing your
11  password, in the course of changing the
12  password, you check messages, if you did or if
13  you didn't?
14      A.   No.
15      Q.   You didn't check messages?
16      A.   No.
17      Q.   Did you testify that Mr. Mitchell
18  called you when you went home after you left
19  him?
20      A.   Yes, he did.
21      Q.   And he called you -- what type of
22  phone did he call you on?
23              MS. PITTS: Objection. Relevance
24          as well as speculation on the part of
25          this witness as to what kind of phone the
              K A R A S C H  &  A S S O C I A T E S

PAGE 44

44

1                    RHONDA MORRIS
2          defendant used to call her.
3              MR. SAVAGE: Well, I can rephrase
4          the question.
5              THE COURT: If you would.
6  BY MR. SAVAGE:
7      Q.   Was it a cell phone or landline
8  phone?
9      A.   On my end?
10      Q.   Yes.
11      A.   I don't recall exactly. I believe
12  it was my home phone.
13      Q.   Do you own a cell phone?
14      A.   Yes, I do.
15      Q.   Do you recall whether he called you
16  on the cell phone or on the home phone?
17      A.   No, I don't.
18      Q.   Do you recall what date you made a
19  complaint with the police about Mr. Mitchell?
20      A.   The date in East Brandywine for the
21  harassment? I don't recall the exact date.
22      Q.   Okay. Had you made other
23  complaints?
24      A.   I made a number of complaints in
25  East Brandywine when he would call me.
              K A R A S C H  &  A S S O C I A T E S

45

1          RHONDA MORRIS
2     Q.    All right.  Do you -- did you -- you
3 don't recall the first time you made one?
4     A.    No, not the exact date.  I believe
5 it was around May 9th.
6     Q.    Now, you testified that Mr. Mitchell
7 had pictures of you?
8     A.    Yes.
9     Q.    And you didn't give him consent to
10 have pictures of you?
11     A.    I didn't give him consent to have
12 the pictures that he sent to other people.
13     Q.    So it's your testimony that he had
14 access to your computer?
15     A.    At some point in time, yes.
16     Q.    And where did you keep your
17 computer?
18     A.    My computer was first -- we were in
19 training together.  I had my computer at the
20 hotel while we were in training and then I had
21 my computer at 1160 North Manor Road.
22     Q.    Is that your current residence?
23     A.    No, it's not.
24     Q.    So you knew Mr. Mitchell while you
25 were in training?

K A R A S C H  &  A S S O C I A T E S

46

1          RHONDA MORRIS
2     A.    Yes, I did.
3     Q.    Did you live with Mr. Mitchell while
4 you were in training?
5     A.    No.
6     Q.    Now, do you have any documents in
7 AOL or any other Internet service provider to
8 substantiate your claims today regarding
9 Mr. Mitchell's use, improper use, of your AOL
10 account?
11     A.    Not yet.
12     Q.    Not yet?
13     A.    I am waiting for hot mail and AOL to
14 respond to my inquiry.
15     Q.    Okay.  When did you make your
16 inquiry?
17     A.    I have made a number of inquiries.
18     Q.    When did you make the first one?
19     A.    The first one, actually Sergeant
20 Crawford, the Uwchlan Township made an inquiry
21 on my behalf, and I have since written.
22     Q.    When was that?
23     A.    I don't know exactly.
24          MR. SAVAGE:  May I see those
25     e-mail messages?

K A R A S C H  &  A S S O C I A T E S

47

1          RHONDA MORRIS
2 BY MR. SAVAGE:
3     Q.    The assistant district attorney
4 showed you a number of e-mail messages.  Is it
5 your testimony that Mr. Mitchell sent you these
6 messages?
7     A.    Yes.
8     Q.    Did you actually watch him send you
9 these messages?
10     A.    No.
11     Q.    Did anyone tell you that he sent you
12 these messages?
13     A.    He did.
14     Q.    He told you that he sent you these
15 messages?
16     A.    In phone calls, conversations, yes.
17     Q.    Okay.  Did you have a record of
18 e-mail messages wherein you told him that you
19 wanted the harassment to stop?
20     A.    Do I have records?  You mean do I
21 have a copy of the message I sent him?
22     Q.    Yes.
23     A.    Yes, I do.
24     Q.    Do you have it with you today?
25     A.    No, I don't.

K A R A S C H  &  A S S O C I A T E S

48

1          RHONDA MORRIS
2          MR. SAVAGE: I have no further
3     questions, Your Honor.
4          THE COURT:  Redirect?
5          MS. PITTS:  Yes, Your Honor, just
6     one.
7          -- REDIRECT EXAMINATION --
8 BY MS. PITTS:
9     Q.    On April 10 of 2000 in your hotel
10 room when the defendant pulled up your e-mail,
11 was that the first time you observed him using
12 your password to get into your e-mail?
13     A.    Yes, it is.
14     Q.    And that would have been something
15 that could have been done without the use of
16 your computer, correct?
17     A.    Correct.
18     Q.    And it was at that point that you
19 went home and changed your password once you
20 realized that?
21     A.    Yes.
22          MS. PITTS:  I have no further
23     questions, Your Honor.
24          THE COURT:  Thank you.  Recross,
25     counsel?

K A R A S C H  &  A S S O C I A T E S

49

1                    CHARLES CRAWFORD

2              -- RECROSS-EXAMINATION --

3  BY MR. SAVAGE:

4      Q.    Ms. Morris, is it your testimony

5  that you have never shared your password with

6  Mr. Mitchell?

7      A.    Yes.

8      Q.    You never have?

9      A.    Never.

10             MR. SAVAGE:  Okay.  I have no

11       further questions, Your Honor.

12             THE COURT:  Thank you, sir.  Are

13       you both done with her?

14             MR. SAVAGE:  Yes.

15             MS. PITTS:  Yes, Your Honor.

16             THE COURT:  You may step down,

17       ma'am.  Watch your step, please.

18             MS. PITTS:  I just would like to

19       call Sergeant Crawford briefly to testify

20       to the date --

21             THE COURT:  Sure.

22             - - -

23       CHARLES J. CRAWFORD, having been duly

24       sworn, was examined and testified as

25       follows:

K A R A S C H   &   A S S O C I A T E S

---

50

1                    CHARLES CRAWFORD

2              -- DIRECT EXAMINATION --

3  BY MS. PITTS:

4      Q.    State your name, spell your last

5  name for the record, please.

6      A.    Charles J. Crawford,

7  C-R-A-W-F-O-R-D.

8      Q.    And Sergeant Crawford, are you aware

9  as to whether or not the Uwchlan Police

10  Department took a complaint from the -- from

11  Ms. Morris on May 27th of 19 -- of 2000?  Excuse

12  me.

13     A.    Yes, I am.  The incident was

14  reported on the 27th of May.

15     Q.    Okay.  That was to the Uwchlan

16  Police Department?

17     A.    Uwchlan -- Officer Obenski of the

18  Uwchlan Police Department.  27th of May to

19  Officer Obenski, O-B-E-N-S-K-I.

20     Q.    Are you aware today as to whether or

21  not Ms. Morris had been in contact with the East

22  Brandywine Police Department prior to the 27th

23  of May?

24     A.    Yes, I am.  On that particular date,

25  after Ms. Morris left our office, Officer

K A R A S C H   &   A S S O C I A T E S

---

51

1                    CHARLES CRAWFORD

2  Obenski came into my office and discussed the

3  case.

4      Q.    So it would be your testimony that a

5  contact had been made with the East Brandywine

6  police prior to May 27th?

7      A.    Yes.

8             MS. PITTS:  No further questions,

9       Your Honor.

10             THE COURT:  Cross-examination?

11             MR. SAVAGE:  Yes.

12             -- CROSS-EXAMINATION --

13  BY MR. SAVAGE:

14     Q.    What is the jurisdiction of the East

15  Brandywine police department?  Is it different?

16     A.    Than my police department?

17     Q.    Yes.

18     A.    Yes, it is.

19     Q.    Okay.  By geographic area?

20     A.    The East Brandywine Township Police

21  Department is the police department right next

22  to ours geographically.  They're west of us.

23     Q.    All right.  So what would be the

24  jurisdiction where Ms. Morris resides?

25     A.    Ms. Morris resides in East

K A R A S C H   &   A S S O C I A T E S

---

52

1                    CHARLES CRAWFORD

2  Brandywine Township.

3      Q.    So is there a particular reason why

4  your office would accept a complaint?

5             MS. PITTS:  Your Honor, I am going

6       to object.  I don't know that this is

7       really the questioning that we need.  We

8       are talking about procedure here.  And as

9       I explained to the Court, we believe that

10       this judicial district is the correct

11       district for the charges that we are

12       talking about here today.

13             THE COURT:  Whether or not it's

14       the correct one, either or, the

15       jurisdiction could take the complaint or

16       the charges, right?

17             MS. PITTS:  I'll defer to Your

18       Honor's discretion as to how we want this

19       to proceed.

20             THE COURT:  I'll sustain the

21       objection.  I believe it's a matter that

22       we should have discussed by the sergeant.

23       Maybe a matter you wish to discuss in

24       your closing for all intents and

25       purposes.  I don't think the sergeant can

K A R A S C H   &   A S S O C I A T E S

53

1                    CHARLES CRAWFORD
2      answer that.
3               MR. SAVAGE:  All right.
4   BY MR. SAVAGE:
5       Q.    Sergeant, did you swear out an
6   affidavit for Mr. Mitchell's arrest?
7       A.    I did not.  Officer Warren Obenski
8   from my police department did.
9       Q.    All right.  And are you the
10  officer's supervisor?
11      A.    In criminal investigations I would
12  be.  He consulted with me on the case.
13              MR. SAVAGE:  I see.  I have no
14  further questions, Your Honor.
15              THE COURT:  You may step down,
16  sergeant.  Thank you.
17              MS. PITTS:  I have no further
18  testimony, Your Honor.
19              THE COURT:  Very well.  Is there
20  any defense testimony today, Mr. Savage?
21              MR. SAVAGE:  No, Your Honor.
22              THE COURT:  Any argument, sir?
23              MR. SAVAGE:  Yes, Your Honor.  As
24  to 2709 B1 and B2, stalking, the statute
25  does not prohibit the sort of conduct
K A R A S C H  &  A S S O C I A T E S

54

1
2   that Mr. Mitchell has allegedly -- has
3   committed.  There is no testimony
4   regarding actual following around.  The
5   only incidence or the testimony in regard
6   to putting someone in fear of bodily
7   injury was through the computer, venture
8   to say miles away through the computer.
9           I believe that if Ms. Morris were
10  in actual fear of bodily injury or under
11  any distress at all, she had ample
12  opportunity to so express that as close
13  in time to the alleged incident as a few
14  minutes as she was walking out of the
15  hotel room.
16          She testified there were people
17  working there.  She didn't make a
18  complaint out until almost a month later.
19  So I believe that the Commonwealth has
20  not made that case as to the stalking.
21          Same argument, Your Honor, with
22  regard to harassment.  Again, just
23  dealing with the computer, Ms. Morris
24  comes to court.  It's my understanding
25  that the Court must take the testimony in
K A R A S C H  &  A S S O C I A T E S

55

1
2   light most favorable to the Commonwealth.
3   Nevertheless, the testimony is that it
4   was done from a distance.  She brought no
5   -- really no real collaborating evidence
6   of all of this except for self-serving
7   documents that she could have generated
8   herself.
9           With regard to the indecent
10  assault, Your Honor, there is testimony
11  that parties did have an intimate
12  relationship, that she fully intended to
13  return to the hotel room.  Her testimony
14  is that they were going to develop a web
15  site together, but she also testified
16  that they had intimate relationship.  I
17  believe that that testimony --
18              MS. PITTS:  I am going to object,
19  Your Honor, to that --
20              THE COURT:  Sustained.  I did not
21  hear that testimony, sir, and I don't
22  know that it was recorded and I sustain
23  the objection.
24              MR. SAVAGE:  Very well, Your
25  Honor.  In any event, Your Honor, the
K A R A S C H  &  A S S O C I A T E S

56

1
2   events that may or may not have occurred
3   in that room do not rise to the burden,
4   they have not met their burden of proving
5   whether or not these acts were
6   nonconsensual.  I believe that the record
7   is very clear that she did not pose a
8   protest, and the fact that she did not
9   make a report or a complaint until almost
10  a month later sort of supports that
11  position.  So with that, Your Honor, I
12  ask for the Court to dismiss all charges.
13              THE COURT:  Thank you, sir.
14  Ms. Pitts?
15              MS. PITTS:  Thank you, Your Honor.
16  As to the charge of the stalking, as Your
17  Honor is well aware, the statute reads
18  that a person commits the crime of
19  stalking when he engages in a course of
20  conduct or repeatedly commits acts toward
21  another person which under subsection two
22  are intended to cause substantial
23  emotional distress to the person.
24          So we believe that we have made
25  out a prima facie case certainly on that
K A R A S C H  &  A S S O C I A T E S

PAGE 57  SHEET 15

57

1
2    charge as well as all of the other
3    charges including the indecent assault
4    charge as well as the amended charges of
5    harassment by communication and unlawful
6    use of the computer. And we believe
7    there's been sufficient testimony to hold
8    over these charges.
9         THE COURT: Thank you. Based on
10   what's been presented and testified to in
11   this court today and -- the defendant
12   will be held on the charges, including
13   the amended charges today, sir. And his
14   bail will be continued as is. A formal
15   arraignment in the Common Pleas Court
16   will be October the 26th of this year of
17   which we will give him a formal notice
18   prior to leaving here today. Make sure
19   we don't leave until we have that
20   information, all right?
21        MR. SAVAGE: Very well.
22        MS. PITTS: Thank you, Your Honor.
23        THE COURT: Thank you. This
24   hearing is over.
25             ••••••••••

K A R A S C H  &  A S S O C I A T E S

---

PAGE 58

58

1
2
3         C E R T I F I C A T E
4         I, Frank R. Austin, CSR, RPR,
5    Commissioner of Deeds of the Commonwealth of
6    Pennsylvania, do hereby certify that I reported
7    the deposition in the above-captioned matter;
8    that the said witness was duly sworn by me; that
9    the reading and signing of the deposition were
10   waived by said witness and by counsel for the
11   respective parties; that the foregoing is a true
12   and correct transcript of the stenographic notes
13   of testimony taken by me in the above-captioned
14   matter.
15        I further certify that I am not a
16   relative or employee or attorney of any of the
17   parties or a relative or employee of such
18   attorney or financially interested directly or
19   indirectly in this action.
20
21
22
23         FRANK R. AUSTIN, RPR, CSR
             COMMISSIONER OF DEEDS
24         MY COMMISSION EXPIRES August 25, 2002
25

K A R A S C H  &  A S S O C I A T E S

# EXHIBIT "K"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GREGORY MITCHELL                                    :
8100 Gorman Avenue, Apt. 315                        :
Laurel, MD  20707                                   :
           Plaintiff                        :       CASE No. 02-CV-3717
       v.                                          :
                                                   :
EDWARD OBENSKI and MATTHEW GALE,                    :
individually and in their official capacities as police    :
officers of the Uwchlan Township Police Department :
717 N. Ship Road                                    :
Exton, PA 19341                                     :
        and                                   :
RHONDA MORRIS, A/K/A RHONDA BALDWIN                 :
1100 N. Manor Road                                  :
Honeybrook, PA  19344                               :
          Defendants                       :

## AMENDED COMPLAINT

### A. THE PARTIES

1. Plaintiff is a citizen of the United States of America who resides at the address stated in the caption.

2. Defendant Police Officer Warren Obenski was at all times relevant to this action a Police Officer of the Uwchlan Township Police Department, and whose business address is stated in the above caption of this case. At all times relevant hereto, defendant Obenski was acting within the scope of his employment with the Uwchlan Township Police Department and under color of state law.

3. Defendant Police Officer Matthew Gale was at all times relevant to this action a Police Officer of the Uwchlan Township Police Department, and whose business address is stated in the

above caption of this case.  At all times relevant hereto, defendant Gale was acting within the scope of his employment with the Uwchlan Township Police Department and under color of state law.

4. Defendant, Rhonda Morris, a/k/a Rhonda Baldwin (hereinafter "Morris") was at all times relevant to this complaint, an adult individual residing at the address stated in the caption.

## B. JURISDICTION AND VENUE

5. Jurisdiction is brought pursuant to 42 U.S.C. §§§1981, 1983, 1985, and the Fourth and Fourteenth Amendments of the United States Constitution.  Jurisdiction is based upon 28 U.S.C. §§ 1331(1), (3), (4) and the aforementioned statutory and constitutional provisions.  Plaintiff further invokes the supplemental jurisdiction of this Court to hear and decide claims arising under state law as said claims arise out of a common nucleus of operative facts.

6. Venue is proper in this District pursuant to Title 28 U.S.C. §1391 as the claims arose in the District and the defendants reside or can be served in this District.

## C. BACKGROUND

7. On or about March 24, 2000, plaintiff loaned defendant Morris one thousand five hundred dollars ($1,500.00) to assist Morris in the purchase or lease of an automobile.

8. Morris promised plaintiff that she would re-pay the loan.

9. On or about May 11, 2000, plaintiff requested an acknowledgement from Morris about the promise to re-pay said loan.

10. Morris refused to give plaintiff any details about how she would re-pay the loan.

11. In the evening of May 11, 2000, at about 8:00 PM, defendant Obenski called plaintiff by telephone and told plaintiff to "watch yourself".

12. In the same evening at about 11:30 PM, defendant Obenski called plaintiff again and told plaintiff to "stop harassing Rhonda".

13. Defendant Obenski claimed that plaintiff was calling Morris without her consent, and offered to prove his point by attempting to reveal plaintiff's telephone number as the number that appears on Morris' caller ID.

14. Plaintiff informed Obenski that said telephone number was not his telephone number, and ended the conversation.

15. On or about June 1, 2000, Officer Obenski drafted a criminal complaint, together with an Affidavit of Probable Cause, for the arrest of plaintiff.

16. A District Justice signed said Affidavit.

17. Despite knowing the home address, work address, and telephone number of plaintiff, Officer Obenski prepared an affidavit of due diligence, indicating that the Court should declare plaintiff a fugitive from justice because plaintiff was a flight risk. Said Affidavit specifically states the following comment:

> "Will flee if notified. Chester County D.A.'s office requested
> fugitive from Justice Warrant, so suspect can be extradited
> from Maryland to PA."

18. Officer Obenski did not swear under oath that he made every effort to place plaintiff in custody before preparing said affidavit of due diligence.

19. Said affidavit is a statement that the defendants are unable to locate plaintiff.

20. On the contrary, defendants were at all times relevant to this complaint, able to locate plaintiff.

21. On June 9, 2000, defendant Gale spoke with a Ms. Martha Gay, the administrator of the Fugitive Extradition Unit of the Chester County District Attorney's Office.

22.   Defendant Gale authorized extradition of plaintiff on the strength of the affidavit of due diligence, and had plaintiff entered into the National Crime Information Computer as a fugitive.

23.   At approximately 3:00 PM on the same day, defendant Gale contacted officials of plaintiff's employer to obtain plaintiff's work schedule.

24.   On or about June 16, 2000, law enforcement authorities apprehended plaintiff at his residence in Maryland and held him until he agreed to waive extradition proceedings for transport to Pennsylvania.

25.   After plaintiff waived extradition, plaintiff was transported to Chester County, whereupon he was arraigned and posted cash bail in the amount of $7,500.00.

26.   Plaintiff was ultimately charged with misdemeanor offenses of harassment and stalking, harassment by communication or address, unlawful use of computer, and indecent assault.

27.   The Chester County District Attorney subsequently reduced these misdemeanor charges to summary offices.

28.   Plaintiff plead not guilty to all charges, and maintained his innocence from the day of his arrest.

29.   After a trial, the Court found plaintiff not guilty of all charges.

30.   Plaintiff believes and therefore avers that the telephone calls from defendant Obenski, the declaration of being a fugitive, the misdemeanor charges and all indignities associated with the arrest are a product of a conspiracy of all defendants to ruin plaintiff's reputation and good name, and force plaintiff to acquire a criminal record and serve a period of incarceration, all to support defendant Morris in her attempt to defraud plaintiff of $1,500.00.

31.  Plaintiff spent time in jail, incurred considerable legal fees and costs, and incurred other costs as a result of the conduct of all defendants.

32. Plaintiff also incurred expenses related to psychological treatment made necessary due to the conduct of the defendants.

## COUNT I
### FEDERAL CIVIL RIGHTS VIOLATIONS
### 42 U.S.C. §§§1981,1983, 1985, and 1988

33. The allegations set forth in paragraphs 1 through 32, inclusive, are incorporated herein as though hereafter stated in full.

34. Defendants falsely accused plaintiff of harassing, stalking and assaulting defendant Morris.

35. Defendants had possession and control of the resources and tools of investigation to conduct a proper investigation of their belief that said plaintiff harassed, stalked and assaulted Morris.

36. Defendants failed to conduct a proper investigation, and in so doing, failed to protect said plaintiff from false allegations, detention, trial, legal fees and expenses.

37. Said false allegations also led to verbal publication of false allegations, false light, invasion of privacy, and infliction of emotional distress, which necessitated plaintiff incurring medical and psychological expenses for treatment.

38. Said negligent investigation is the proximate cause of plaintiff's suffering, humiliation, oppression, and anxiety stemming from defendants' actions.

39. Plaintiff avers that had defendants' conducted a proper investigation, then defendants would not have so accused plaintiff of criminal acts.

40. Defendants' actions exceeded the normal standards.

41. Plaintiff believes and therefore avers that all of the aforementioned actions perpetuated by defendants constitute a concerted attempt to violate his constitutional right to freedom of movement, freedom from harassment, freedom from abuse by government agents, and constitute an attempt to deprive plaintiff of his money and liberty under color of law.

42. Defendants deprived plaintiff of the rights secured unto him by the Constitution of the United States, in particular, the Fourth and Fourteenth Amendments thereof and in violation of 42 U.S.C. §§ 1981, 1983, and 1985 in the following respects:

    a. Fabricating allegations that plaintiff harassed, stalked and assaulted Morris,

    b. Fabricating an allegation that plaintiff was a flight risk,

    c. Causing plaintiff to be falsely arrested and detained in and out of secured institutions as a consequence of said false allegations,

    d. Causing plaintiff to spend substantial sums of money for bail, legal fees and costs, and expenses related to psychological treatment due to the fabrication of allegations,

    e. Interfering with the relationship between plaintiff and his employer caused by said false allegations, i.e. causing plaintiff to miss serveral days of work and lose income while detained and while making appearances in Court.

    f. Placing plaintiff in a bad light from the standpoint of his employer and other law enforcement authorities,

    g. Causing plaintiff psychological injury, and

    h. Violating the policies and procedures of the Chester County District Attorney's Office, the Court of Common Pleas of Chester County, the District Courts of Chester County, the Uwchlan Township Police Department Operating Rules, and the Rules established by the Commonwealth of Pennsylvania regarding the apprehension of suspects.

    i. Conspiring between themselves and others to deprive plaintiff of precious rights of freedom and privacy.

43. As a direct and proximate cause of the actions and omissions of the defendants aforesaid actions, enumerated above by number and letter, deprived plaintiff of equal protection, privileges and immunities, and due process of law, established under the laws and the Constitution of the United States.

44. Defendants' aforesaid actions also deprived plaintiff of his right to live securely in his person and property.

45. As a direct and proximate cause of the actions and omissions of the defendants, plaintiff was deprived of the liberty to move freely, along with other precious rights, privileges and immunities secured unto him by the laws and Constitution of the United States.

46. Plaintiff demands attorney fees, costs, expenses, and punitive damages in connection with this litigation, pursuant to 42 U.S.C. §1988.

WHEREFORE plaintiff requests judgment against all defendants, together with interest, cost of suit, and attorney's fees, and such other relief as the Court shall deem just and proper. Plaintiff also request punitive damages against all defendants.

## COUNT II
## BREACH OF CONTRACT
## MITCHELL V. RHONDA BALDWIN A/K/A RHONDA MORRIS

47. The allegations set forth in paragraphs 1 through 46, inclusive, are incorporated herein as though hereafter stated in full.

48. Morris accepted $1,500.00 as a loan to assist her in the lease or purchase of an automobile.

49. Morris promised to repay said loan.

50. Morris has not yet repaid the loan.

51. Plaintiff has requested re-payment, and Morris has refused.

52. Plaintiff asserts that Morris is still obligated to re-pay this loan.

WHEREFORE, plaintiff requests that this court order defendant to pay plaintiff $1,500.00

for satisfaction of said loan.

## JURY TRIAL DEMAND

53. Plaintiff demands a trial by jury.

Respectfully submitted,

*Milton S. Savage, Esquire*

MILTON S. SAVAGE, JR., ESQUIRE

Dated: July 2, 2002